UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § § § | |
| Plaintiff, | | |
| v. | § § | CIVIL ACTION NO. 3:08-CV-0438-B (ECF) |
| RYAN M. REYNOLDS, ET. AL., | § § § | |
| Defendant. | | |

## MEMORANDUM ORDER DENYING DEFENDANTS' MOTION TO UNFREEZE OR MODIFY ASSET HOLD

This a securities fraud case. After agreeing to a preliminary injunction freezing approximately $1.1 million of their assets (doc #58), Defendants Jason Wynn and Wynn Industries (collectively, the "Wynn Defendants") now move to unfreeze those assets entirely, or, alternatively, for a adjustment of the amount frozen. The Wynn Defendants maintain that Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") erred by failing to acknowledge certain losses and expenses in calculating the amount to be frozen. The SEC counters that its accounting technique is legally sound and that the amount frozen is a reasonable approximation of gains resulting from Wynn Defendants' allegedly illegal conduct. Having considered Wynn Defendants' Motion to Unfreeze Assets or in the Alternative Reduce the Amount of the Asset Freeze (doc #69), Plaintiff's Response, Wynn Defendants' Reply and all evidence and argument in support and opposition, the Court finds that Wynn Defendants' Motion should be **DENIED** as set forth below.

1

# I.

# BACKGROUND

This suit stems from an alleged penny-stock securities fraud scheme involving a mass marketing campaign to sell unregistered securities at inflated prices. Specifically, the three defendant groups, including Defendants Jason Wynn and Wynn Industries, are accused by the SEC of attempting to to sell unregistered shares of Beverage Creations, Inc. ("BCI") at inflated prices without providing the full disclosures mandated under securities laws.[1] (Compl. ¶1). Each Defendant purchased 3,333,333 shares of BCI stock on January 28, 2008, for $.02 per share, purportedly with the goal of reselling those shares to the public. (Compl. ¶¶6-11) Upon receiving their shares, certain Defendants engaged in the widespread resale of the stock. (Compl. ¶35). According to the SEC, BCI represented to the public that it was developing a proprietary sports drink complete with a canister of breathable, pressurized oxygen. In reality, the SEC states, BCI had no production facilities, product sales, or inventory. (Compl. ¶16). No registration statement was in effect for any of the sales to the public. (Compl. ¶44). Defendants allegedly engaged in manipulative trading practices, such as sales to friends, family, and others to give the appearance of heightened demand for BCI stock. (Compl. ¶40). In approximately February 2008, Defendants launched a national campaign, incorporating full-color promotional mailers using captions such as, "THIS STOCK COULD EXPLODE!" to allegedly bolster the share price even further. (Compl. ¶47). In addition,

---

[1]The Court's recitation of pertinent background facts and citation to the Complaint should not be taken as any finding that the allegations in the Complaint are true. Defendants have moved to dismiss this suit, and therefore have not answered, so the Court cannot now judge which allegations are in dispute. Based on the parties' briefing on this Motion, the salient facts referenced in the Analysis section herein do not appear to be disputed.

a webpage (administered by the sister of one of the other defendants) sent out at least six unsolicited emails further touting the investment opportunity. (Compl. ¶51). Defendants' marketing efforts were apparently successful, as the BCI stock price increased considerably to close at a high of $1.83 on March 10, 2008. (Compl. ¶60).

Along with its original complaint alleging violations of Sections 5(a) and (c) of the Securities Act (15 U.S.C. §§ 77e(a) and (c)) and Section 10 of the Exchange Act (15 U.S.C. §78j(b)) and Rule 10b-5 thereunder (17 C.F.R. § 240 10b-5), the SEC filed a Motion for Temporary Restraining Order, Preliminary Injunction and Order Freezing Assets. (doc #7). That motion was granted the same day and a TRO entered against the Defendants which included an asset freeze. (doc #10). Subsequently, the Wynn Defendants filed an Emergency Motion for Relief seeking, in part, to modify the asset freeze. (doc #19). The Court ordered the parties to confer on that Motion to see if an interim agreement could be reached. (doc #33). During the face-to-face negotiations, the Wynn Defendants and Plaintiff agreed that the asset freeze would be modified to approximately $1.1 million. (docs #37, 58). The Wynn Defendants argue that they agreed to $1.1 million, based on a good faith belief that the SEC staff would recommend, and the Commission would approve, an additional modification and reduction of the freeze to $500,000. (doc #70).[2] Although this reduction was apparently recommended by the SEC negotiators, it was ultimately not approved at higher levels.

---

[2] According to the Joint Status Report, dated March 27, 2008, "These revisions to the asset freeze portion of the TRO are intended to be interim measures, while the Defendants and the Commission staff finalize negotiations of a further modification of the asset freeze and the Commission staff recommends any such agreement to the Commission for its approval." (doc #37, ¶9).

Thus, the Wynn Defendants filed their Motion to Unfreeze Assets or in the Alternative Reduce the Amount of the Asset Freeze. The SEC argues that the asset freeze should remain unchanged, as it has met its burden of showing that the amount frozen is a reasonable approximation of gains illegally received. The Wynn Defendants argue that because Plaintiff's calculation is flawed based on its exclusion of certain alleged costs and expenses and thus, the amount of the asset freeze is unreasonable and should be modified.

## ANALYSIS

"The district court has broad discretion in fashioning the equitable remedy of a disgorgement order." *SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir. 1993). The use of disgorgement as an equitable remedy is well-established in securities fraud disputes. "Disgorgement wrests ill-gotten gains from the hands of a wrongdoer. It is an equitable remedy meant to prevent the wrongdoer from enriching himself by his wrongs." *Allstate Ins. Co. v. Receivable Fin. Co.*, 501 F.3d 398, 413 (5th Cir. 2007). However, the underlying purpose behind disgorgement differs from those of traditional fines. An order for disgorgement is not restitution or a debt, but is "more akin to an injunction in the public interest." *Huffman*, 996 F.2d at 802 (quoting *Pierce v. Vision Investments Inc.*, 779 F.2d 302, 307 (5th Cir. 1986.)

"In actions brought by the SEC involving a securities violation, disgorgement need only be a reasonable approximation of profits casually connected to the violation." *Allstate Ins. Co.*, 501 F.3d at 413. "Once the SEC meets its burden of showing that its disgorgement figure reasonably approximates the amount of the unjust enrichment, the burden shifts to the defendant to demonstrate that the disgorgement figure was not a reasonable approximation." *SEC v. Amerifirst*

4

*Funding, Inc.*, 3:07-CV-1188, 2008 WL 1959843 (N.D. Tex. May 5, 2008)(citing *SEC v. First City Fin. Corp.*, 890 F.3d 1215, 1231 (D.C. Cir. 1989)).

The burden of showing that the amount subject to an asset freeze is a reasonable approximation of the profits received rests squarely on the Plaintiff. Plaintiff SEC has shown, through the calculations and evidence submitted in the Kustusch Declaration, that the Wynn Defendants realized $ 966,514.27 in gains from their BCI stock sales. (doc #70, Appendix in Support.). In its Response to the instant motion, however, the SEC submitted no evidence, argument, or authority to support freezing $133,485.73 beyond that amount (for a total of $1.1 million).[3] Presumably the additional amount is to reserve for possible civil penalties. The Court notes that the SEC has prayed for civil penalties under 15 U.S.C. §§ 77t(d) and 78u(d)(3), and that penalties of well over $133,000 are potentially available if the allegations in the Original Complaint are proven true. Further, although the Fifth Circuit has not spoken on the issue of whether potential civil penalties should be captured in an asset freeze, this Court and other Circuit courts have recognized the propriety of freezing funds for penalties under similar circumstances. *See, e.g., SEC v. Amerifirst Funding*, No. 3:07-CV-1188, 2007 WL 2192632, at *3 (N.D. Tex. July 31, 2007); *see also SEC v. Cherif*, 933 F.2d 403, 416 n. 15 (7th Cir. 1991); *SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990). Therefore, the current amount of $1.1 million appears to be a reasonable approximation for the asset freeze.

The Wynn Defendants' arguments criticize Plaintiff's refusal to consider certain information, not its fundamental accounting methodology. First, Defendants Wynn and Wynn Industries argue

---

[3]Wynn Defendants do not point out this discrepancy between Plaintiff's proof and the amount currently frozen and present no arguments concerning asset freezes for potential civil penalties.

that the current asset freeze amount is unreasonable because Plaintiff failed to account for the costs of Defendants' purchases of BCI stock on the open market, which Defendants assert should be offset against alleged trading gains. Second, the Defendants claim that their marketing expenses should be offset against alleged trading gains. Neither of these criticisms find support in the case law and policy underlying disgorgement under the securities laws.

### Deductibility of Subsequent BCI Stock Purchases

The Wynn Defendants' primary objection to Plaintiff's calculation of profits is that the cost of certain BCI stock purchases on the open market was not deducted from the total trading gains. Specifically, the Wynn Defendants note "purchases of over 700,000 shares of stock that were not factor[ed] into Kustusch's calculation to support the asset freeze." (doc #70). Kustusch admits that differing profit figures can be shown, depending on whether those shares are considered. *See* Kustusch Deposition, 145: 23- 146:2. (doc #70, Appendix in Support).

For example, a profit amount of $966,514.27 is obtained, when using a "modified FIFO [first-in, first-out]" method, which considers all of the stock sold by the Wynn Defendants between January 28 and March 11, 2008 to have been part of the original 3.3 million shares of BCI stock purchased by Wynn Industries for $.02 each on January 28. (Kustusch Supplemental Declaration, Ex. E (Doc #70, Appendix in Support)).[4] This figure does not subtract the cost of subsequent stock purchases. *Id.* In contrast, only $164,757.75 in gains result using modified FIFO when the cost of

---

[4] When using FIFO, earlier input costs (such as cost of goods sold) are attributed to earlier outputs (such as sales revenue). In a period of rising costs, these earlier inputs tend to be lower, with the end result that profit figures are larger when using FIFO. Contrast this with LIFO (last-in, first-out), which attributes most recent inputs to later outputs. As expected, higher costs translate to lower profits.

6

the open-market purchases of stock after January 28 are included. (Kustusch Supplemental Declaration, Ex H (Doc #70, Appendix in Support)).

The Wynn Defendants concede that Plaintiff's use of FIFO in calculating profits based on stock sales is a reasonable accounting approach, but argue only that the costs of further stock purchases should also be subtracted from the FIFO-calculated amount of gains. Def.'s Reply at 4. According to the Wynn Defendants, the proper calculation accounts for the cost of all of their BCI stock, including the original 3.3 million shares purchased on January 28, 2008 and the shares purchased later on January 31, February 1, 4, 5, 6, 7, 8, 11, 12-15, 19-21, and March 3 and 6, 2008. *See* Kustusch Supplemental Declaration, Ex B (Doc #70, Appendix in Support)).

However, the Wynn Defendants' purchases of BCI stock after January 28, 2008 are best characterized as re-investment of ill-gotten gains. They cannot dispute that all of their sales of shares acquired on January 28 were sold for far more than $.02 each, thereby eliciting some profit on every share–how they spent the money thereafter does not change the initial profit made. "A person remains unjustly enriched by what was illegally received, whether he retains the proceeds of his wrongdoing [or not]." *SEC v. United Energy Partners, Inc.*, No. 02-10850, 2004 WL 315185, at *2 (N.D. Tex. Feb. 18, 2004) (affirming district court refusal to modify disgorgement order even though defendants argued they could not pay the amount ordered). As this Court has previously stated, "[a] securities violator may not avoid his responsibility to turn over his ill-gotten gains by claiming that he is no longer in possession of the funds due to subsequent unsuccessful investments or other types of discretionary spending." *SEC v. AMX Int'l, Inc.*, 872 F. Supp. 1541, 1544 (N.D. Tex. 1994). *See also SEC v. Druffner*, 517 F. Supp.2d 502, 511-512 (D. Mass. 2007) ("What the defendant does with the illegally obtained profits is irrelevant for the purposes of disgorgement.... To

7

hold otherwise would give incentive to parties to engage in securities violations with no threat of monetary repercussions so long as the illegally obtained profits are squandered prior to a lawsuit."); *SEC v. Benson*, 657 F. Supp. 1122, 1134 (S.D.N.Y. 1987) ("The manner in which [the defendant] chose to spend his misappropriations is irrelevant as to his objection to disgorge.").

Moreover, it is only the resale of shares that were part of the 3.3 million unregistered shares purchased on January 28 that forms the basis of Plaintiff's claims for violations of Sections 5(a) and (c) of the Securities Act for offering and selling unregistered shares of stock and Section 10 of the Exchange Act for committing fraud upon purchasers of those shares. The subsequent purchases of stock do not need to be considered, because the Wynn Defendants did not even resell all of the original 3.3 million shares to the public.[5] The Wynn Defendants' characterization of Plaintiff's claims as relying on their (the Wynn Defendants') subsequent purchases of BCI stock after January 28 is inaccurate. There is nothing in Plaintiff's Complaint that relies on the subsequent purchases, and accordingly, no reason to consider those costs in determining the amount for the potential disgorgement/asset freeze.

### Deductibility of Marketing Expenses

The Wynn Defendants' second challenge to the reasonableness of the asset freeze amount is that the freeze fails to account for marketing expenses the Wynn Defendants' allegedly incurred in connection with BCI. Considering the purpose behind the remedy of disgorgement, there is insufficient justification to support the subtraction of marketing expenses in determining the asset freeze amount. See e.g., *SEC v. JT Wallenbrock & Assoc.*, 440 F.3d 1109, 1115 (9th Cir.

---

[5]As noted above, Wynn Defendants have not objected to the FIFO method of determining gains from the stock sales, which relies on the construct that the first share purchased is also the first share sold.

2006) (refusing to allow "offset[s] for *entirely illegitimate* expenses incurred to perpetrate an *entirely fraudulent* operation.") (emphasis in original). "Any risk of uncertainty [in the measure of disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004). Although some courts have allowed an offset for legitimate business expenses while other courts find that expenses should never be an offset, the Court does not reach that issue, as the only evidence submitted suggests that the alleged marketing expenses are not legitimate expenses. *See SEC v. Thomas James Assocs, Inc.*, 738 F. Supp. 88, 95 (W.D.N.Y. 1990) *but cf. SEC v. Hughes Capital Corp.*, 917 F. Supp. 1080, 1087 (D.N.J. 1996) (collecting cases regarding expense offsets).

First, the Wynn Defendants submitted no evidence in support of the instant Motion, instead relying on a March 2008 affidavit from Defendant Wynn, submitted by Plaintiff, that merely attaches letters from a company called Tri-Win that appears to provide printing and mailing services in Dallas, Texas. Plaintiff's Response at Ex. 5. (doc#77). Wynn's affidavit says nothing about what exactly Tri-Win was doing for Wynn. Neither the affidavit nor any of the Tri-Win letters identify in any useful way what specific marketing materials Tri-Win may have printed and/or mailed. *See Id.* Argument and after-the-fact explanation from Wynn's counsel cannot substitute for admissible evidence. The only evidence of marketing materials before the Court is the promotional mailer submitted by Plaintiff. It is unclear from the Wynn Defendants' briefing whether this material is the marketing material in which Tri-Win was involved for which they seek credit for the costs thereof. The Wynn Defendants have clearly not met their burden of identifying the alleged expenses they seek to offset, even if such an offset was appropriate.

9

Assuming *arguendo* that the promotional mailer submitted by Plaintiff is the material for which the Wynn Defendants request an offset, even a cursory examination of the mailer reveals that it was not intended to promote a product, as the Wynn Defendants argue, but rather to generate demand for the stock. First, the mailer begins with "Dear Investor," a salutation not to potential customers of a new sports drink, but rather to those who would like to make "275 to 350% [in] 30 to 60 days." *See* Plaintiff's Response at Ex. 5 (doc #77). Second, there is no information about how/where to locate or buy the product. Third, there is no evidence that BCI had a product that had been developed and was for sale anywhere or to anyone.

Fourth, to the extent that the mailer was supposed to create market awareness of BCI, as the Wynn Defendants argue, that is the central focus of the allegedly fraudulent scheme that this Court has enjoined. The crux of this case is that the Wynn Defendants, and the other defendants, were allegedly promoting BCI with false promises, representations, and/or omissions about the business in an attempt to increase demand, so they could illegally sell their unregistered shares into the market at inflated prices. It is difficult to see how a mailer "to create market awareness" does anything other than further the purpose of Defendants' scheme. To the extent there is a question about the legitimacy of the Wynn Defendants' marketing materials, they should bear the burden on that question. *Calvo*, 378 F.3d at 1217. The Defendants have not shown that they have any legitimate expenses that should be offset against the gains that the SEC has proved they obtained in the sale of unregistered shares of BCI. *Amerifirst Funding*, 2008 WL 1959843 at *4 (holding that it is proper to exclude business expenses when the defendant has not proved they are legitimate). Because the marketing expenses allegedly incurred by the Wynn Defendants appear to be central to Defendants' fraudulent actions, those amounts cannot be used as an offset against trading gains.

## CONCLUSION

The modified FIFO technique used by the SEC in calculating the Wynn Defendants' gains for the purpose of a disgorgement analysis results in a reasonable approximation of the profits that the Wynn Defendants realized from their allegedly illegal BCI stock sales. Crediting the Wynn Defendants for costs related to the disposal of those profits and for business expenses that they have not proved are related to BCI or are legitimate would not comport with the purposes of the securities laws. For all of the reasons detailed above, Defendants' Motion to Unfreeze Assets or in the Alternative Reduce the Amount of the Asset Freeze is **DENIED.**

**SO ORDERED.**

Dated: August 22, 2008

_____
JANE J. BOYLE
UNITED STATES DISTRICT JUDGE