IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:08-CV-438-B (BK) |
| RYAN M. REYNOLDS, et al., | § § § | |
| Defendant. | § § | |

**CERTIFICATION OF FACTS CONSTITUTING CONTEMPT OF COURT**

Pursuant to the District Court's *Order of Reference* (Doc. 225), filed November 9, 2010, the Court considered *Plaintiff's Motion for Order to Show Cause Why Defendant Ryan Reynolds Should Not Be Held in Contempt of Court* (Doc. 219, 220), filed October 18, 2010. On December 15, 2010, the Court conducted a hearing to determine whether to certify facts of Defendant Reynolds's alleged contempt to the district judge. Defendant Reynolds appeared in person and through counsel and Plaintiff also appeared through counsel.

The Federal Magistrate Judges Act requires that for acts that constitute civil contempt, a magistrate judge shall forthwith certify facts to a district judge. 28 U.S.C. § 636(e)(6)(B)(iii). The Court concludes that certain actions and inactions of Defendant Reynolds violate orders of the District Court and, therefore, constitute civil contempt. Accordingly, the undersigned has determined that further proceedings are warranted and, therefore, certifies the following facts constituting contempt to the United States District Judge:

**FACTS CERTIFIED**

    1. On March 13, 2008, Plaintiff sued Reynolds, Bellatalia, and two fellow penny stock promoters for funneling millions of shares of Beverage Creations, Inc. to the public without providing investors the protection of registration. (Doc. 1.). On the same day Plaintiff filed its original complaint, the District Court granted Plaintiff's motion for a temporary restraining order and ordered a freeze of all of Reynolds's assets. (Doc. 10). The District Court's Order bars Reynolds from "***directly or indirectly*** withdrawing, transferring, selling, pledging, ***encumbering***, assigning, dissipating, concealing or otherwise ***disposing of in any manner*** any funds, assets, accounts or other property belonging to, or directly or indirectly in the possession, custody or control of any Promoter Defendant, or in which any defendant has a beneficial interest, wherever located." (Doc. 10 at p. 5) (emphasis added).

    2. After Reynolds bought the condominium discussed below, and at the time Reynolds's assets were frozen, he had over $2.1 million in cash remaining in two accounts at Amegy Bank. (Doc. 221, Ex. C at App. 44-89).

    3. On April 2, 2008, in response to an agreed motion, the District Court modified the temporary restraining order, ordering $1.216 million of Reynolds's assets frozen and $1.127 million of co-defendant, Jason Wynn's assets frozen. (Doc. 44). Reynolds volunteered to have his condominium frozen to cover the combined potential $2.34 million BCI-related liability for himself and Wynn. (Doc. 44). The District Court's April 2, 2008, asset freeze order expressly recognizes that Reynolds's condominium was frozen to satisfy the $2.34 million asset freeze. (Doc. 44). Reynolds subsequently testified at the hearing before the undersigned that he understood that the condominium was subject to the asset freeze and stated that he understood

that the District Court's order meant that "if I lost the case against the SEC, they would get my condo." (12/15/10 Tr. 61:5-9).

4. Once Reynolds's bank accounts were released from the freeze, he immediately began withdrawing significant sums. In April and May 2008, he withdrew all $2.1 million from his two accounts at Amegy Bank. (Doc. 221, Ex. C at App. 58-59, 70-71, 98-99, 116.).

5. In addition, Reynolds sent almost $1 million to accounts in his name at Kitco, Inc. and Dillon Gage, Inc. – two precious metal retailers. (Doc. 221, Ex. C at App. 58, 60-61, 98, 101-104, 115; Ex. H at App. 169-172). From April 2008 through 2010, Reynolds bought more than 100 pounds of gold and silver, for which he paid more than $1.5 million. (12/15/10 Tr. 13:3 – 14:19; Gov. Ex. 6; Gov. Ex. 7). Reynolds took physical possession of all such bars and coins. (12/15/10 Tr. 15:18-20; 22:9-14; 23:24 – 24:7; 35:8-14).

6. For at least the last two years, Reynolds has not paid property taxes on the condominium. (12/15/10 Tr. 59:19 – 60:5). In 2010, Reynolds made no payments for utilities or for monthly condominium association assessments relating to the condominium. (12/15/10 Tr. 38:15 – 40:18). Reynolds failed to pay condominium-related expenses even though he understood he had an obligation to do so. (12/15/10 Tr. 60:17 – 61:4).

7. Throughout 2010 if not earlier, Reynolds had the money to pay property taxes and monthly assessments, but chose to spend his money for other purposes. (12/15/10 Tr. 59:19 – 61:25). In January 2010, instead of paying property taxes or monthly assessments for the condominium in which he was then living, Reynolds chose instead to spend over $100,000 purchasing gold coins. (12/15/10 Tr. 39:11 – 42:25). In February 2010, instead of paying property taxes or monthly assessments for the condominium in which he was then living,

Reynolds chose instead to spend over $20,000 purchasing gold coins. (12/15/10 Tr. 40:19 – 41:10). In June 2010, instead of paying property taxes or monthly assessments for the condominium in which he was then living, Reynolds chose instead to spend over $30,000 purchasing gold coins. (12/15/10 Tr. 41:20 – 42:9).

8. Reynolds testified at the hearing before the undersigned that he has liquidated all of his gold and silver holdings. (12/15/10 Tr. 42:10-21). Reynolds claimed that he used the proceeds from his gold sales to cover various day-to-day expenses and attorneys' fees. (E.g., 12/15/10 Tr. 16:4-6, 20:9-17, 23:2-11, 24:18-20). However, Reynolds did not provide the Court with documentary evidence to confirm the existence or amount of any of his purported expenses, or to otherwise substantiate his claim that the proceeds from his gold and silver sales were used to satisfy those expenses. When asked to quantify his expenses, Reynolds testified that, while he did not pay any monthly expenses in connection with living in his condominium, he did pay $5000 per month to his former assistant, even after she stopped performing any work for him (12/15/10 Tr. 54:4-17); that he paid unspecified attorneys' fees (12/15/10 Tr. 54:25 – 55:7); and that he provided $1,000 per month in child support to his fiancée and paid $1,000 per month for food (12/15/10 Tr. 53:7-24). Reynolds also claimed that he lost the great majority of the proceeds from those gold sales by making "bets against certain stocks or the stock market in general" and in a failed venture involving "wholesaling school supplies and office supplies out of China." (12/15/10 Tr. 44:10-45.17, 49:9-14).

9. On October 25, 2010, based on Reynolds's failure to pay his condominium assessments and utility bills, the Ritz-Carlton filed a lien against the title of Reynolds's condominium for $28,484.76. (Doc. 226, Ex. A). At the December 15, 2010 hearing, Reynolds

testified that, based on his failure to pay his condominium assessments and utility bills, his condo association was preparing to send him a notice of foreclosure. (12/15/10 Tr. 59:4-12).

10. On December 3, 2010, Dallas County initiated proceedings to foreclose on a lien it has placed on the title of the condominium based on Reynolds's failure to pay $139,333.96 in property taxes on his condominium in 2008 and 2009. (Decl. of T. Leiman, Ex. 2).

## CONCLUSION

Based on these facts, the undersigned concludes that facts are present that may constitute contempt and warrant the District Judge to take further action. To prove that Reynolds should be held in civil contempt, Plaintiff need only establish that (1) a court order was in effect, (2) the order required specified conduct by Reynolds, and (3) Reynolds failed to comply with the order. *See U.S. v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). Furthermore, "the contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000); *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers of Am.*, 609 F.2d 165, 168 (5th Cir. 1980) ("in civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order"). Although Reynolds is claiming the defense of impossibility, he has not meet his burden to provide this Court with evidence regarding the same. *U.S. v. Rylander*, 460 U.S. 752, 757 (1983) ( "in raising [the] defense [of impossibility], the defendant has a burden of production.").

The determination of whether Defendant Reynolds should be held in contempt will be made by the District Judge. Accordingly, Defendant Reynolds should be prepared to appear

before United States District Judge Boyle to show cause why he should not be held in contempt by reason of the facts certified by this Court. 28 U.S.C. § 636(e)(6)(B)(iii).

**SIGNED** on February 3, 2011.

_____
RENÉE HARRIS TOLIVER
UNITED STATES MAGISTRATE JUDGE