UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, : : : Plaintiff, : : v. : : RYAN M. REYNOLDS, et al., : : Defendants. : : | Civil Action No: 3:08-CV-438-B  ECF |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
PRE-HEARING SUBMISSION IN SUPPORT OF ITS
<u>MOTION FOR CONTEMPT AGAINST DEFENDANT RYAN REYNOLDS</u>**

In April 2008, this Court froze $2,343,584.26 to cover the potential liability of Ryan Reynolds and his co-defendant Jason Wynn. As a vital part of a settlement of the preliminary injunction in this matter, Reynolds agreed to put up his luxury condominium to satisfy the entire $2.34 million asset freeze. That pledge came with an important condition: he was prohibited from "directly or indirectly" "encumber[ing]" the condominium "in any manner." (Dkt. #10 at 5.) After conducting an evidentiary hearing, the Magistrate Court concluded that Reynolds deliberately refused to pay his property taxes and assessments for the condo and that his conduct therefore "constitute[s] civil contempt." (Dkt. #243, 2/3/11 Certification of Facts ("COF") ¶¶ 1, 6-7.) The Magistrate Judge's "Certification of Facts Constituting Contempt of Court" – to which Reynolds did not object – reflects that (a) Reynolds was a multi-millionaire at the time of the asset freeze (COF ¶ 2), (b) rather than pay his property taxes and assessments, Reynolds chose to use his funds to purchase over 100 pounds of gold and silver (COF ¶¶ 5-7), and (c) because of Reynolds' conduct, the title to the condominium was encumbered by liens filed by Dallas County and his condo board (COF ¶¶ 9-10). Those mounting liens – and Reynolds' persistent refusal to pay his taxes – threatened the value of the only asset set aside by this Court to satisfy a judgment, effectively forcing a sale

1

in advance of a threatened foreclosure. That sale quantifies the consequence of Reynolds' contempt. The sale generated $1,434,245.47 in net proceeds – $909,338.79 short of the amount the Court ordered frozen. If this Court reaches the same conclusions as the Magistrate Court, Plaintiff, the U.S. Securities and Exchange Commission (the "Commission") respectfully requests that the Court order that Reynolds be incarcerated until he either (1) returns the parties to the *status quo ante* by turning over assets worth $909,338.79 – the amount required to bring Reynolds into compliance with the asset freeze order or (2) proves that compliance is impossible.

**I.      The Commission Can Establish That Reynolds Violated The Asset Freeze**

The Magistrate Court's findings of fact reflect that the Commission can establish its *prima facie* showing that (1) an unambiguous order was in place and (2) Reynolds violated that order. This Court's asset freeze expressly barred Reynolds from either directly or indirectly encumbering title to his condo. (COF ¶ 1, 3.) As detailed in the Magistrate Court's findings, Reynolds made a mockery of that order. Even after paying $2.9 million in cash for his condo, Reynolds had at least $2 million at his disposal at the time of the asset freeze (COF ¶ 2). Despite the clear terms of that order, Reynolds simply decided that he would not pay his property taxes or assessments – the most basic requirement for any homeowner to protect the title of his or her home. (COF ¶¶ 6-7.) While he shirked his obligations under the asset freeze, he lived in his luxury condo for free (COF ¶ 6) and amassed a literal pile of gold bars and coins (COF ¶ 5).

If this Court agrees with the Magistrate Judge's undisputed finding that Reynolds, at some point, had the assets to comply with the asset freeze, this Court should presume – absent Reynolds' proof to the contrary – that he has the *current* ability to comply. *See U.S. ex rel. Thom v. Jenkins*, 760 F.2d 736, 739-40 (7th Cir. 1985) ("It is well-settled that if a court finds that a defendant could at some time in the past have complied with a court order, the court should presume a present ability to comply…"); *see also SEC v. Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d , 459-60 (S.D.N.Y. 2001) (holding defendant in contempt and

incarcerating him for failure to turn over assets where the Commission demonstrated that defendant possessed the assets three years before the contempt order).

## II. Thus far, Reynolds Has Not Fulfilled His Burden of Production

At the upcoming hearing, the focus – and the burden of production – will shift to Reynolds. He will need to establish "clearly, plainly, and unmistakably" that he cannot comply with this Court's freeze order. *See Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir. 1995). To succeed on his impossibility defense Reynolds must "go beyond a mere assertion of inability, and establish that he has made in good faith all reasonable efforts to meet the terms of the court order he is seeking to avoid." *CFTC v. Wellington Precious Metals, Inc.,* 950 F.2d 1525, 1529 (11th Cir. 1992) (internal quotes and citations omitted); *see also SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395, 2000 WL 968010, at *6 (S.D.N.Y. Aug. 8, 2000).

Reynolds has had three opportunities to demonstrate that he is unable to comply with this Court's orders. Each time, he has failed to present credible evidence regarding the dispersal of his fortune. First, in his response brief, Reynolds stated that his net worth has "dwindled to almost nothing" because of unspecified failed investments. (Dkt. #224, Def. Br. at 5.) Reynolds did not offer a shred of documentary proof to support that solitary statement. Second, at the December 15, 2010 hearing before Judge Toliver, Reynolds offered only his own unsupported and shifting testimony on how he dispersed his millions. Initially, Reynolds claimed that he sold his gold bars and coins and used the proceeds to cover his day-to-day expenses and attorney's fees. (E.g., 12/15/10 Hearing Tr. 16:4-6, 20:9-17, 23:2-11, 24:18-20.) Later in the hearing, Reynolds shifted back to the story from his brief, claiming that he lost the great majority of the proceeds from his gold sales in the stock market (12/15/10 Tr. 44:10 - 45:17) and in a failed office supply business (12/15/10 Tr. 49:9-14). Because Reynolds did not provide the Magistrate Court with any documentary evidence to substantiate either story, Judge Toliver discounted Reynolds' testimony, holding that "Although Reynolds is claiming the defense of impossibility, he has not met his burden to provide this

Court with evidence regarding the same." (COF ¶ 5.) Third, at his January 26, 2011 deposition, the Commission confronted Reynolds with evidence reflecting that (1) Reynolds attempted to hide his assets by transferring millions of dollars to a brokerage account in the name of a corporate entity owned by his then 23 year-old secretary, (2) he withdrew over $566,000 in cash from that brokerage account in 2010 alone, and (3) starting in April 2008, Reynolds directed his secretary to make a series of $9,000 withdrawals from Reynolds' bank account – an amount apparently designed to avoid IRS reporting requirements under the Bank Secrecy Act, 31 U.S.C. § 5313. (1/26/11 Reynolds Tr. 28-33.) Reynolds refused to answer any of the Commission's questions regarding that damning evidence, instead invoking his Fifth Amendment right against self-incrimination. (*Id.*)

The upcoming hearing affords Reynolds his fourth opportunity to demonstrate that he is too destitute to comply with the asset freeze. To do so, however, Reynolds will need to provide (a) comprehensive documentary proof establishing that he has no assets to remedy his contempt; and (b) a detailed, sworn accounting, including documentary support, showing precisely how he dispersed his fortune. *See SEC v. Showalter*, 227 F. Supp. 2d 110, 122 (D.D.C. 2002) (in ruling that defendant failed to establish his impossibility defense to a contempt motion, holds that "[a] complete accounting by [defendant], under oath, with appropriate supporting documentation, is an essential predicate for [him] to meet his burden of demonstrating inability to pay"). Among other assets, Reynolds must show how he dispersed:

- over $144,000 in cash that he withdrew from his bank accounts in $9,000 increments in April 2008;

- the proceeds of his sale of over 100 pounds of gold and silver between April 2008 and December 2010; and

- over $566,000 that Reynolds withdrew from a brokerage account under his control at Titan Securities in 2010.

Reynolds' evidentiary showing must be credible and subject to cross-examination. *See U.S. v. Sorrells*, 877 F.2d 346, 349-51 (5th Cir. 1989); *U.S. v. Rylander*, 460 U.S. 752, 758 (1983) (holding in a contempt hearing

that "This was a time for testimony, and [defendant's] *ex parte* affidavit and uncross-examined testimony were properly disregarded by the District Court). A repeat of his unsupported testimony before Judge Toliver is not sufficient.

### III. Reynolds Cannot Fulfill His Burden of Production While Refusing To Testify.

After his performance in the Magistrate Court, Reynolds has apparently decided that he will no longer testify about how he dispersed his fortune. At his deposition last month, Reynolds invoked the Fifth Amendment and refused to answer any of the Commission's questions regarding evidence that Reynolds hid his millions with his secretary. (1/26/11 Reynolds Tr. at 28-33.) If Reynolds repeats that performance at the upcoming contempt hearing, his burden of proof will remain unsatisfied. The U.S. Supreme Court has expressly rejected the tactic that Reynolds appears poised to employ, holding that "while the assertion of the Fifth Amendment privilege…may be a valid ground upon which a witness…declines to answer questions, it has never been thought to be in itself a substitute for evidence that would assist in meeting a burden of production." *Rylander*, 460 U.S. at 758; *see also Sorrells*, 877 F.2d at 351-52; *SEC v. Towers Fin. Corp.*, No. 93-civ.-0744-WK-AJP, 1996 WL 406685, *3 (S.D.N.Y. March 26, 1996) (finding defendant in contempt for failure to pay on a judgment, holding that "while [defendant] has the legal right to assert his Fifth Amendment privilege, by doing so he has not met his burden of proving his impossibility defense to the contempt motion").[1]

---

[1] Even if defendants <u>could</u> somehow avoid their burden of production by pleading the Fifth, Reynolds' assertion of privilege is inappropriate in this context. Reynolds waived his privilege at the December 15, 2010 contempt hearing when he provided lengthy, albeit unsupported, testimony about how he disposed of his fortune. While the Magistrate Court did not credit that testimony, Reynolds' failure to assert his Fifth Amendment privilege operates as a waiver. *Princeton Econ. Int'l Ltd.*, 152 F. Supp. 2d at 460-61 (holding that contemnor waived his Fifth Amendment rights by testifying at an earlier contempt hearing regarding disposition of his gold bars and coins).

**IV.     If Reynolds Fails to Fulfill His Burden Of Production, He Should Turn Over Sufficient Assets to Make The Commission Whole.**

Reynolds' contempt has undeniably harmed the Commission. By failing to maintain clean title to his condominium, Reynolds deliberately slashed the value of the only asset set aside by this Court to satisfy a judgment. Because of his deliberate failure to pay taxes and assessments, the condo was encumbered by liens filed by Dallas County and the Ritz Carlton condo board. Moreover, at the Magistrate Court hearing, Reynolds admitted that his actions exposed the condo to imminent foreclosure. With liens mounting and Reynolds demonstrating no intention of fulfilling his tax and assessment obligations, the Commission agreed to allow a sale of the condo to (a) preserve its remaining value, and (b) prevent a forced foreclosure sale that could have netted a much lower price. That January 20, 2011 sale allows the Court and the Commission to quantify the damage from Reynolds' contempt.

For the sale to close, delinquent property taxes, assessments and closing fees in the amount of $365,754.53 had to be paid out of the $1.8 million sale price. All that remains after Reynolds' contempt is $1,434,245.47, currently frozen with the Bankruptcy Trustee. Reynolds' decision to ignore his obligation to not encumber the title to his Condo therefore created an immediate, quantifiable harm of $365,754.53 -- the amount that had to be spent out of the frozen assets to remove liens and complete the Condo sale forced by Reynolds' misconduct. That is the minimum amount that Reynolds should pay to purge his contempt.

However, that is not the full measure of the damage Reynolds has caused. By flouting the freeze order, Reynolds has created an additional harm: he effectively forced the rapid sale of a unique, luxury asset into a severely depressed market. That additional harm is difficult to quantify. Because Reynolds' misconduct has brought us to this point, any uncertainty in determining the amount of damage caused by his contempt should be resolved against Reynolds.[2] Moreover, the overall damage to the Commission is clear.

---

[2] In an analogous setting, with a similar burden-shifting standard, courts routinely hold that – in determining the amount of disgorgement to be paid by a wrongdoer – "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989).

The Commission negotiated, and the Court ordered, a $2,343,584.26 asset freeze to protect investors in the event of a judgment against Reynolds. Because of Reynolds' misconduct, $1,434,245.47 remains – $909,338.79 short of the amount that this Court ordered frozen.

If the Court finds Reynolds in contempt of the asset freeze, and Reynolds cannot prove to this Court that he is unable to comply, Reynolds should be ordered to turn over $909,338.79 – the amount required to (a) return the parties to the position they were in before his contempt and (b) bring Reynolds into compliance with the Court's $2.34 million asset freeze.

## V.     The Court Should Incarcerate Reynolds Until He Remedies His Contempt

If Reynolds fails to return his assets or establish his inability to do so, he should "be incarcerated until he pays the [money] or produces evidence demonstrating categorically and in detail that any further payment is impossible. No lesser coercive sanction could conceivably produce compliance." *Universal Express, Inc.,* 546 F. Supp. 2d at 142.

For almost three years, Reynolds has treated the Court's asset freeze with disdain. He has admitted that he never paid property taxes for his condo and has not paid assessments since January 2010. (COF ¶ 6.) As the Magistrate Court found, Reynolds refused to pay on those obligations "even though he understood that he had an obligation to do so." (*Id.*) Reynolds had millions of dollars at his disposal from which he could have complied with the asset freeze, but instead he used his fortune to purchase over 100 pounds of gold and silver. (COF ¶¶ 4-5, 7-8.) Despite claiming poverty, Reynolds has thus far refused every opportunity to demonstrate how his wealth was purportedly squandered. Courts routinely order incarceration in response to such intransigence. *See SEC v. Elmas Trading Corp.,* 824 F.2d 732, 733 (9th Cir. 1987) (finding no abuse of discretion where the District Court rejected defendant's unsupported impossibility defense and incarcerated defendant until he complies with the court's order to produce documents); *SEC v. Novus Tech., LLC,* No. 2:07-CV-235, 2008 WL 783635, at *1 (D. Utah Mar. 21, 2008)

(ordering incarceration of defendant who failed to provide an accounting of receivership proceeds); *SEC v. Bilzerian,* 131 F. Supp. 2d 10, 18 (D.D.C. 2001) ("Given Bilzerian's facially deficient accounting, the only remedy is to incarcerate Bilzerian until he provides the information covered by the Court's order or, at a minimum, until he demonstrates a credible and good faith effort to do so").

## VI.     Reynolds' Bankruptcy Does Not Affect This Proceeding or the Relief Sought

As the Commission predicted in its initial brief (Dkt.#220, at n.7), Reynolds attempted to derail this proceeding by filing a petition for bankruptcy less than 24 hours before the show cause hearing in the Magistrate Court. Judge Toliver recognized that this last minute tactic "seems suspicious of an attempt perhaps to circumvent this Court's – the District Court's authority," and held that Reynolds' bankruptcy does not affect the inherent authority of the Court to enforce its own orders and, therefore, does not stay the contempt proceeding against Reynolds. (Hearing Tr. 4-8.)

In so holding, Judge Toliver relied on the remarkably similar case of *SEC v. Wolfson*, 309 B.R. 612 (D. Utah 2004). In *Wolfson*, as here, the SEC filed a contempt motion against a defendant for violating an asset freeze and provided extensive evidence that the defendant had been hiding assets. *Wolfson*, 309 B.R. at 614-15. The defendant used the same tactic that Reynolds has used here: faced with overwhelming evidence of his contempt, defendant in *Wolfson* "sought refuge in the bankruptcy court less than four hours before the…hearing on the Commission's motions." *Id*. at 616. As Reynolds argued in the Magistrate Court, the defendant in *Wolfson* argued that his last-minute bankruptcy filing should stay the contempt proceeding. *Id*. at 616. The *Wolfson* court rejected that argument, holding that (a) the District Court has concurrent jurisdiction to determine the effect of a defendant's bankruptcy on District Court proceedings (*id*. at 617-18), (b) Commission enforcement actions are excepted from the automatic stay under Bankruptcy Code Section 362(b)(4) (*id*. at 619-20), and (c) the District Court could continue with the contempt proceeding and enforce its asset freeze (*id*. at 620). *See also SEC v. Bilzerian*, 112 F. Supp. 2d 12, 13-14

8

(D.D.C. 2000) (holding defendant in contempt for failure to pay disgorgement despite defendant's earlier bankruptcy petition).

Reynolds' bankruptcy petition will not relieve him of his burden of proof in the face of the Commission's *prima facie* case. *Id*. He still must demonstrate his inability to comply with the asset freeze "categorically and in detail." *Id*. at 16. Moreover, if Reynolds, once again, is unable to fulfill that burden, his bankruptcy does not affect the District Court's power to order Reynolds to turn over assets to comply with the asset freeze and to incarcerate him until he does so. *Wolfson*, 309 B.R. at 620, 626 (holding that "regardless of the existence of [defendant's] bankruptcy petitions" defendant must turn over assets subject to the District Court's asset freeze or he "will be incarcerated until he complies in full, regardless of any relief sought or obtained in the Bankruptcy Court.").[3]

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court (a) find Reynolds in contempt of its asset freeze orders, and (b) order that Reynolds be incarcerated until he either (i) turns over assets worth $909,338.79 to remedy his contempt or (ii) proves that compliance is impossible.

Dated: March 1, 2011

Respectfully submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/ Timothy S. Leiman
By:  One of its Attorneys
John E. Birkenheier (*admitted pro hac vice*)
Jonathan S. Polish (*admitted pro hac vice*)
Timothy S. Leiman (*admitted pro hac vice*)
Attorneys for the Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: 312-353-7390
Fax: 312 353-7398

---

[3] The only effect of Reynolds' bankruptcy is that, if this Court holds him in contempt of the asset freeze, any assets that he turns over should be turned over to the Bankruptcy Trustee pending further order of the Court.

## CERTIFICATE OF SERVICE

      I hereby certify that on March 1, 2011, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.


                                    /s/  Timothy S. Leiman