IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § | NO. 3:08-CV-0438-B |
| v. | § § | ECF |
| RYAN M. REYNOLDS, ET AL. | § § | |
| Defendants. | § § | |

**THE PARTIES' JOINT STATEMENT OF UNDISPUTED FACT IN ADVANCE OF THIS COURT'S MARCH 10, 2011 HEARING ON PLAINTIFF'S MOTION FOR A RULE TO SHOW CAUSE WHY DEFENDANT RYAN REYNOLDS SHOULD NOT BE HELD IN CONTEMPT OF COURT FOR VIOLATING THE ASSET FREEZE**

Pursuant to this Court's February 22, 2011 Order (Dkt. #246), the Parties respectfully submit the following Joint Statement of Undisputed Fact in conjunction with Plaintiff Securities and Exchange Commission's (the "Commission's") Motion For A Rule to Show Cause Why Defendant Ryan Reynolds Should Not Be Held In Contempt Of Court For Violating The Asset Freeze (Dkt. #219):

**THIS COURT'S ORIGINAL ASSET FREEZE**

1.  On March 13, 2008, the Commission sued Reynolds and others for alleged registration violations in connection with their resale of shares of Beverage Creations, Inc. ("BCI") to the public without providing investors the protection of registration.

2.  In his Answer, Reynolds alleges that the offerings were exempt from registration and, therefore, that no registration violations occurred.

3.  On the same day the Commission filed its original Complaint, the Court granted the Commission's motion for a TRO and ordered a freeze of all of Reynolds' assets.

4. The Court's Order barred Reynolds from "directly or indirectly withdrawing, transferring, selling, pledging, encumbering, assigning, dissipating, concealing or otherwise disposing of in any manner any funds, assets, accounts or other property belonging to, or directly or indirectly in the possession, custody or control of [Reynolds], or in which [Reynolds] has a beneficial interest, wherever located." (Dkt. #10, 3/13/08 TRO, at p. 5, ¶ II(A).)

## THE FREEZE IS NARROWED TO REYNOLDS' CONDOMINIUM

5. In January 2008, Reynolds bought a condominium at the Residences at the Ritz Carlton, 2525 N. Pearl St., Unit #1502, Dallas, Texas for more than $2.8 million which he paid in cash (the "Condominium" or "Condo").

6. As part of an agreement with the Commission to settle a dispute over the proper scope of the asset freeze, Reynolds agreed to have his Condominium frozen to cover the BCI-related liability for himself and his co-defendant Jason Wynn.

7. On April 2, 2008, in response to an agreed motion, the Court modified the asset freeze. (Dkt. #44, 4/2/08 Order.)

8. The Court's April 2, 2008 asset freeze order states that "Assets of Defendants Ryan Reynolds and Bellatalia LP worth $1,216,230.27 are to remain frozen. Assets of Defendants Jason Wynn and Wynn Industries LLC worth $1,127,353.99 are to remain frozen…The assets that will remain frozen pursuant to the TRO as hereby modified with respect to Defendants Ryan Reynolds, Bellatalia, LP, Jason Wynn, and Wynn Industries, LLC shall consist of certain real estate located at 2525 N. Pearl, #1502, Dallas, Texas 75201, which real estate has been identified to and is acceptable to the SEC. The real estate frozen pursuant to the TRO as hereby modified shall be available to satisfy a judgment against any one of the Defendants Ryan Reynolds, Bellatalia, LP, Jason Wynn, and Wynn Industries,

LLC without regard to the outcome of this proceeding as to the others of those Defendants." (Dkt. #44, 4/2/08 Order.)

9. Reynolds has testified that he understood that the Condominium was subject to the asset freeze. (12/15/10 Tr. 61:5-9.)

10. Since April 2, 2008, the Condominium has been subject to the provision in the asset freeze order identified in ¶ 4.

11. In August 2010, a third-party appraiser determined that the Condo had a market value of $1.92 million as of August 17, 2010.

12. Reynolds lived in the Condominium until on or about January 19, 2011.

## REYNOLDS' CASH WITHDRAWALS AND PURCHASES OF PRECIOUS METALS

13. Defendant Ryan Reynolds is the sole owner of Defendant Bellatalia, LP ("Bellatalia").

14. As of April 2, 2008, Reynolds had over $2.1 million in cash remaining in two accounts at Amegy Bank – one account in his name and one account in the name of Bellatalia LP.

15. In April and May 2008, Reynolds withdrew all $2.1 million from those two accounts at Amegy Bank.

16. In April 2008, Reynolds made the following cash withdrawals of $9,000 each from accounts in the name of Ryan Reynolds and Bellatalia, LP at Amegy Bank:

| DATE | AMOUNT |
|---|---|
| 4/03/08 | $9,000 |
| 4/04/08 | $9,000 |
| 4/08/08 | $9,000 |
| 4/09/08 | $9,000 |
| 4/10/08 | $9,000 |
| 4/11/08 | $9,000 |
| 4/11/08 | $9,000 |

| DATE | AMOUNT |
|------|--------|
| 4/14/08 | $9,000 |
| 4/14/08 | $9,000 |
| 4/22/08 | $9,000 |
| 4/15/00 | $9,000 |
| 4/17/08 | $9,000 |
| 4/23/08 | $9,000 |
| 4/24/08 | $9,000 |
| 4/25/08 | $9,000 |
| 4/28/08 | $9,000 |

(Dkt. #221, Ex. C at App. 58-59, 62-65, 67-68, 70-71, 73, 77, 79-82, 84, 98-99, 105, 107-08.)

17. From April 2008 through the end of 2010, Reynolds made the following purchases of gold and silver from Kitco, Inc. and Dillon Gage, Inc. – two precious metal retailers:

| Date | Purchased Items / Event | Purchase Price |
|------|-------------------------|----------------|
| 4/10/2008 | 50 Gold American Buffalo Coins (1 oz. ea.) (Kitco) | $48,830.50 |
| 4/11/2008 | 102 Gold American Buffalo Coins (1 oz. ea.) (Kitco) | $99,453.06 |
| 4/11/2008 | 102 American Gold Eagle Coins (1 oz. ea.) (Kitco) | $99,452.04 |
| 4/14/2008 | 300 Gold South African Krugerrand Coins (1oz. ea.) (DG) | $281,100.00 |
| 4/14/2008 | 200 Gold South African Krugerrand Coins (1oz. ea.) (DG) | $187,400.00 |
| 4/15/2008 | 202 Gold American Buffalo Coins (1 oz. ea.) (Kitco) | $198,234.72 |
| 6/19/2008 | 10 Gold Bars (1 Kilo. Ea.) (DG) | $292,200.00 |
| 7/14/2008 | 3 Gold Bars (1 kilo ea.) (DG) | $94,233.00 |
| 7/22/2008 | 5 Gold Bars (1 kilo. ea.) (DG) | $156,680.00 |
| 10/15/2008 | 1 Gold Bar (10 oz.) (DG) | $8,600.00 |
| 1/14/2010 | 65 Gold Austrian Philharmonic Coins (1 oz. ea.) (DG) | $77,265.50 |
| 1/29/2010 | 32 Gold American Buffalo Coins (1 oz. ea.) (DG) | $34,050.00 |
| 2/4/2010 | 10 Gold South African Krugerrand Coins | $10,910.00 |

| | | |
|---|---|---|
| | (1oz. ea.) (DG) | |
| 2/5/2010 | 10  Gold South African Krugerrand Coins (1oz. ea.) (DG) | $10,795.00 |
| 6/4/2010 | 25  Gold American Buffalo Coins (1 oz. ea.) (DG) | $31,750.00 |

(Dkt. #221, Ex. C at App. 58, 60-61, 98, 101-104, 115; Ex. H at App. 169-172.)

18. Reynolds took physical possession of all of the bars and coins identified in ¶ 19.

19. At the December 15, 2010 hearing in the Magistrate Court, Reynolds testified that has bought and sold gold and silver since April 2, 2008.

## REYNOLDS STOPS PAYING EXPENSES RELATED TO THE CONDOMINIUM

20. Reynolds has never paid property taxes for the Condominium.

21. In January 2010, Reynolds stopped making payments for utilities and for monthly association assessments relating to the Condominium.

22. Reynolds did not pay Condominium-related expenses even though he understood he had an obligation to do so.

23. Throughout 2010, Reynolds had the money to pay property taxes and monthly assessments, but spent his money for other purposes.

24. In January 2010, Reynolds did not pay property taxes or monthly assessments for the Condominium in which he was then living.  That month, Reynolds spent over $100,000 to purchase gold coins.

25. In February 2010, Reynolds did not pay property taxes or monthly assessments for the Condominium in which he was then living.  That month, Reynolds spent over $20,000 to purchase gold coins.

26. In June 2010, Reynolds did not pay property taxes or monthly assessments for the Condominium in which he was then living. That month, Reynolds spent over $30,000 to purchase gold coins.

27. At the December 15, 2010 Magistrate Court Hearing, Magistrate Judge Toliver asked the following question and Reynolds gave the following response:

> THE COURT: And when you had the money and you were buying the gold and silver, did you feel that you didn't have to pay those condo fees and property taxes at that point?
> Just what were you thinking?
>
> THE WITNESS: My thinking was I can make this up and get back going and have some revenue to be able to pay it, obviously, because I would have liked to have kept living there.

The Commission does not believe that Reynolds' testimony was reflected in his actions.

28. Reynolds testified to the Magistrate Court that he has liquidated all of his gold and silver holdings.

29. At the December 15, 2010 hearing in the Magistrate Court, Reynolds testified that he used the proceeds from his gold sales to cover various day-to-day expenses and attorney's fees. (E.g., 12/15/10 Tr. 16:4-6, 20:9-17, 23:2-11, 24:18-20.) Reynolds identified the following expenses at the hearing: $5,000 per month in salary to his former assistant (12/15/10 Tr. 54:4-17); attorneys' fees (12/15/10 Tr. 54:25 – 55:7); $1,000 per month in child support to his fiancé; and $1,000 per month for food (12/15/10 Tr. 53:7-24).

30. At the December 15, 2010 hearing, Reynolds did not provide the Magistrate Court with any documentary evidence to confirm the existence or amount of his expenses, or to confirm his testimony that the proceeds from his gold and silver sales were used to satisfy those expenses.

31. At the December 15, 2010 Magistrate Court hearing, Reynolds also testified that he lost the great majority of the proceeds from his gold sales by making "bets against certain stocks or the stock market in general" (12/15/10 Tr. 44:10 - 45:17) and in a failed venture involving "wholesaling school supplies and office supplies out of China" (12/15/10 Tr. 49:9-14).

32. At the December 15, 2010 hearing, Reynolds did not provide the Magistrate Court with any documentary evidence to confirm the existence or performance of his failed investments or to confirm his testimony that he used the proceeds from his gold sales to place those failed investments.

## CREDITOR LIENS ARE FILED

33. On October 25, 2010, based on Reynolds' failure to pay condominium assessments and utility bills, the Ritz-Carlton recorded a lien against the title of Reynolds' Condominium for $28,484.76.  (Dkt. #226, Ex. A.)

34. On December 3, 2010 – based on Reynolds' failure to pay $139,333.96 in property taxes on his Condominium in 2008 and 2009 – Dallas County initiated proceedings to foreclose on a lien on the title of the Condominium.

35. At the December 15, 2010 hearing, Reynolds testified that – based on his failure to pay his condominium assessments and utility bills – his condo association was preparing to send him a notice of foreclosure.  (12/15/10 Tr. 59:4-12.)

## REYNOLDS' BANKRUPTCY

36. On December 14, 2010, Reynolds filed a Voluntary Petition for protection under Chapter 7 of the Bankruptcy Code with the U.S. Bankruptcy Court for the Northern District

of Texas, Dallas Division. The bankruptcy case is captioned <u>In re Ryan M. Reynolds</u>, 10-bk-38773 (N.D. Tex.). That case is still pending.

37. At 5:01 p.m. on December 14, 2010, Reynolds filed a Notice of Suggestion of Bankruptcy with the District Court, notifying the Court of his bankruptcy petition.

## THE SALE OF REYNOLDS' CONDOMINIUM

38. On January 20, 2011 Reynolds' condominium was sold for $1.8 million.

39. To allow the sale to close, $365,754.53 was paid out of the sale proceeds at closing to:

    (a)    pay Dallas County to remove its lien for unpaid property taxes for the Condominium;

    (b)    pay the condo board of the Residences at the Ritz Carlton to remove its lien for unpaid assessments and utility bills at Reynolds' Condominium; and

    (c)    pay closing costs, title insurance, and agent commissions.

40. If the payments identified in ¶ 39 had not been made, the sale of the Condominium would not have closed.

41. The remaining sale proceeds of $1,434,245.47 remain frozen pending further order from this Court.

## REYNOLDS' JANUARY 2011 DEPOSITION

42. On January 26, 2011, the Commission took Ryan Reynolds' deposition.

43. Reynolds has informed the Commission that he has been notified that he is the subject of a criminal investigation.

44. At the deposition, the Commission asked the following questions and, in response, Reynolds invoked his Fifth Amendment rights and did not answer the question:

```
Q. Who owns ST Holdings?
```

A. Fifth.

Q. Is it true that you created ST Holdings as a company in the name of your assistant, Stephanie Tubbs?
A. Fifth.

Q. Isn't it true that although the company is not in your name that you maintain control over the funds for ST Holdings?
A. Fifth.

Q. Same questions for Barnano. Is it true that you set up the company Barnano?
A. Fifth.

Q. Is it true that you set up the company so that you could control assets but put them under the name of your assistant, Stephanie Tubbs?
A. Fifth.

Q. Did you transfer over $2.5 million of your own money to ST Holdings?
A. Fifth.

Q. And did you later paper those transactions to make them appear to be loans to ST Holdings?
A. Fifth.

Q. And isn't it true that the loans to ST Holdings were not intended to be the obligation of Stephanie Tubbs?
A. Fifth.

Q. And didn't you maintain control over the funds that you transferred to ST Holdings?
A. Fifth.

Q. ST Holdings maintained a trading account at a brokerage firm called Titan Securities. Isn't it true that you maintained trading authority over that account?
A.    Fifth.

Q. Isn't it true that the loans that you sent to ST Holdings were never paid back?
A. Fifth.

Q. And isn't it true that the notes for those loans were not disclosed on your bankruptcy petition?
A. Fifth.

Q. And isn't it true that you transferred gold and silver to ST Holdings under the name of Stephanie Tubbs?
A. Fifth.

Q. Isn't it true that you directed Stephanie Tubbs to withdraw $9,000 in cash from your bank accounts on a regular basis starting in April of 2008?
A. Fifth.

Q. Is it true that you chose that $9,000 amount to avoid bank reporting requirements that kick in at the $10,000 level?
A. Fifth.

Q. Isn't it true that the proceeds from the Titan Securities' ST Holdings' account belonged to you?
A.   Fifth.

MR. LEIMAN: I would like to mark as Reynolds Exhibit 16 a copy of a brokerage statement for ST Holdings,LLC.
(Exhibit Number 16 marked.)
Q. (BY MR. LEIMAN) Do you recognize this document?
A. Fifth.

Q. Isn't it true that you received copies of the brokerage statements for ST Holdings, LLC?
A. Fifth.

Q. Directing your attention to the series of items listed under Valuation at a Glance. There is an entry for cash withdrawals. It says year to date, $103,116.14. Isn't it true in the year 2009 that a cash withdrawal in that amount was sent to you during 2009?
A. Fifth.

Q. Isn't it true that when cash is withdrawal from this account at Titan Securities that the cash would be sent to you?
A. Fifth.

Q. Is it true that if I ask you any further questions about this brokerage statement that you will plead the Fifth?
A. It is.

Q. And is it true if I ask you any further questions about the operations of ST Holdings that you will plead the Fifth?
A. It is.

MR. LEIMAN: I would like to mark as Reynolds
Exhibit 17 a copy of an Account Statement for ST
Holdings at Titan Securities for the period ending
June 30th, 2010.
(Exhibit Number 17 marked.)
Q. (BY MR. LEIMAN) Do you recognize this document?
A. Fifth.

Q. Is it true that you received a copy of this
Brokerage Statement?
A. Fifth.

Q. Again, looking at the items under the heading
Valuation at a Glance, looking at the cash withdrawal
line. It says year to date, $566,300.38. Is it true
that from the beginning of 2010 until the end of June
2010 that you withdrew $566,300.38 from the ST
Holdings' Titan Securities' account?
A.   Fifth.

Q. Is it true that that amount was directed from ST
Holdings to you personally?
A. Fifth.

Q. Is it true that if I ask you any further questions
about this brokerage statement that you will plead the
Fifth?
A. It is.

Q. Is it true if I ask you any questions about the
trading of ST Holdings in this Titan Securities'
account that you will plead the Fifth?
A. It is.

Q. Is it true that the proceeds from the trading in
Reynolds Exhibits 16 and 17 belong to you?
A. Fifth.

MR. LEIMAN: I would like to mark as Reynolds
Exhibit 18 a copy of an ST Holdings' Account Statement
at Titan Securities for the period ending August 31st,
2010.
(Exhibit Number 18 marked.)
Q. (BY MR. LEIMAN) Do you recognize this document?
A. Fifth.

Q. Is this an Account Statement for ST Holdings'
account at Titan Securities?
A. Fifth.

```
Q. Again, looking at the items under Valuation at a
Glance, the cash withdrawal line. It shows an item for
this period. This period being August of 2010.
Withdrawal of $14,265.89. Isn't it true that in August
of 2010, you withdrew $14,265.89 from the ST Holdings'
account at Titan Securities
and directed it to yourself?
A.    Fifth.

Q. Isn't it true that you directed Stephanie Tubbs to
conduct all of the transactions that are shown in the
Brokerage Account Statements that I have been showing
you today?
A. Fifth.

Q. Is it true that you own a car leasing business?
A. Fifth.

Q. Isn't it true that Barnano Enterprises or Barnano
conducts leasing of automobiles?
A. Fifth.

Q. And do you receive proceeds from that business?
A. Fifth.

Q. Isn't it true that you have been receiving payments
from that business all of this year?
A. Fifth.
```

## DOCUMENTS

45.   Pages DG 9 – DG 27 of the document marked as Exhibit 6 at the December 15, 2010 Magistrate Court Hearing in this matter are true and correct copies of invoices and account summaries reflecting precious metal transactions between Dillon Gage, Inc. of Dallas on the one hand and Ryan Reynolds and Bellatalia on the other hand.

46.   Pages Kitco 5 – Kitco 7 of the document marked as Exhibit 7 at the December 15, 2010 Magistrate Court Hearing in this matter are true and correct copies of invoices and account summaries reflecting precious metal transactions between Kitco, Inc. and Bellatalia, LP.

47. The photographs marked as Exhibits 1-5 and 8-9 at the December 15, 2010 Magistrate Court Hearing in this matter accurately depict the interior of Reynolds' condominium at 2525 N. Pearl St., Unit #1502, Dallas, Texas as of August 1, 2010.

48. The document marked as Exhibit 17 at Ryan Reynolds' January 26, 2011 deposition in this case is a true and correct copy of a June 2010 monthly brokerage statement for an account in the name of ST Holdings, LLC at Titan Securities.

49. The document marked as Exhibit 18 at Ryan Reynolds' January 26, 2011 deposition in this case is a true and correct copy of an August 2010 monthly brokerage statement for an account in the name of ST Holdings, LLC at Titan Securities.

50. Regarding the appendix of exhibits (Dkt. #221) that the Commission filed on October 18, 2010 in connection with its Motion for a Rule to Show Cause (the "Appendix"):

   (a) Pages App. 2 through App. 40 of the Appendix are true and accurate copies of monthly brokerage statements of an account in the name of Bellatalia LP at Fagenson and Co., Inc. (with account numbers redacted by the Commission and arrows added by the Commission to identify cash withdrawals);

   (b) Page App. 42 of the Appendix is a true and correct copy of IRS Forms W-2 for Bellatalia LP and Lugano Funds LP reflecting wages and taxes for 2007;

   (c) Pages App. 44 through App. 120 of the Appendix are true and correct copies of monthly statements for bank accounts held in the name of Bellatalia LP and Ryan Reynolds at Amegy Bank, including cancelled checks and withdrawal slips (with account numbers redacted by the Commission);

   (d) The document at pages App. 122 through App. 155 of the Appendix is a true and correct copy of an August 17, 2010 real estate appraisal report by Edgar Appraisal

Services, Inc. reflecting its appraisal of Reynolds' Condominium at 2525 N. Pearl St., Unit #1502, Dallas, Texas;

  (e) The document at page App. 164 of the Appendix is a true and correct copy of a May 9, 2010 "Delinquent Tax Statement" sent by the Dallas County Tax Assessor to Ryan Reynolds (with account numbers redacted by the Commission); and

  (f) The document at pages App. 166 through App. 167 of the Appendix is a true and correct copy of an August 20, 2010 "Statement of Account" sent by Barkan Management Co., Inc. (the management company for The Residences at the Ritz Carlton) to Ryan Reynolds (with account numbers redacted by the Commission).

51. In the bankruptcy case, <u>In re Ryan M. Reynolds</u>, 10-bk-38773 (N.D. Tex.), Dkt. #1 is the original December 14, 2010 Voluntary Petition filed by Ryan M. Reynolds.

52. In the bankruptcy case, <u>In re Ryan M. Reynolds</u>, 10-bk-38773 (N.D. Tex.), Dkt. #11 is Reynolds' January 10, 2011 "Emergency Motion to Approve Sale of Home."

53. In the bankruptcy case, <u>In re Ryan M. Reynolds</u>, 10-bk-38773 (N.D. Tex.), Dkt. #9 is Reynolds' January 5, 2011 Amended Schedule D.

Dated: March 4, 2011

              Respectfully submitted,

              **UNITED STATES SECURITIES**
              **AND EXCHANGE COMMISSION**

      By: <u>/s/ Timothy S. Leiman</u>
         By: One of its attorneys
         Jonathan S. Polish
         Timothy S. Leiman
         Lori V. Jacobs
         Chicago Regional Office
         175 W. Jackson Blvd, Suite 900
         Chicago, Illinois  60604
         Telephone:  (312) 353-6884

*ADMITTED PRO HAC VICE*

**RYAN M. REYNOLDS**

BY: \_/S/ DAVID A. CARP\_\_\_
**DAVID A. CARP**
ATTORNEY FOR DEFENDANTS RYAN M.
REYNOLDS AND BELLATALIA LP
HERZOG & CARP
P.O. BOX 218845
HOUSTON, TX 77218-8845
(713) 781-7500

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2011, I electronically filed the foregoing document with the clerk of court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to all attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

/s/  Timothy S. Leiman