UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| v. | § § | CIVIL ACTION NO. 3:08-CV-438-B |
| RYAN M. REYNOLDS, et al., | § § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is the SEC's Motion for a Rule to Show Cause Why Defendant Ryan Reynolds ["Reynolds"] Should not be Held in Contempt of Court for Violating the Court's Asset Freeze Orders filed October 18, 2010 (doc. 219). For the reasons below and as found by the Court at the March 10, 2011 hearing on this Motion, the Court finds that Reynolds is in contempt of the Court's asset freeze orders. In order to purge his contempt, Reynolds is hereby **ORDERED** to pay into the Court's registry **$909,338.79 by March 30, 2011**. Further, Reynolds is hereby **ORDERED** to surrender his passport to the Clerk of the Court **within 48 hours**, with whom the passport will remain until Reynolds purges his contempt. Reynolds is hereby **ORDERED** to appear before this Court on **Thursday, March 31 at 3:30 p.m.** to determine whether he has purged his contempt.

## I.

## FACTUAL BACKGROUND

This case concerns allegations of penny stock "pumping and dumping" by Defendants. The SEC alleges that Defendant Ryan Reynolds, along with other Defendants, participated in a scheme

to defraud investors by acquiring penny stocks, extensively advertising these stocks with representations that the stocks were set to rise in value, trading in these stocks through their companies and through family members in order to help increase the stocks' value, and then selling these stocks after the subsequent rise in their  value, generating extraordinary returns for Defendants. The case is currently set for trial on June 13, 2011. Order Nov. 19, 2010.

## II.

### PROCEDURAL HISTORY

The SEC's complaint was originally filed on March 13, 2008.[1] On the same day the Court granted the SEC's motion for a temporary restraining order and ordered a freeze over all of Reynold's assets. Order Mar. 13, 2008. The Order barred Reynolds from "directly or indirectly withdrawing, transferring, selling, pledging, encumbering, assigning, dissipating, concealing or otherwise disposing of in any manner any funds, assets, accounts or other property belonging to, or directly or indirectly in the possession, custody, or control of any Promoter Defendant, or in which any defendant has a beneficial interest, wherever located." *Id.* at 5. On April 2, 2008, in response to an agreed motion and the parties' Joint Status Report,[2] the Court modified the temporary restraining order, ordering

---

[1] Defendants Beverage Creations, Inc., Robert Wieden, and Patrick Dado consented to entry of final judgment on March 19, 2009, which was entered on April 6, 2009. Defendants Carlton Fleming, Regus Investment Group, LLC, and Thomas Wade Investments, LLC consented to entry of permanent injunctions on December 29, 2010, which was entered on January 3, 2011, representing partial settlements of this action as to those Defendants. Defendants Jason Wynn and Wynn Industries, LLC consented to entry of permanent injunctions on January 26, 2011, which was entered on the same day, representing partial settlements of this action as to those Defendants.

[2] Prior to filing the Agreed Motion, Reynolds represented that his condo, which he purchased in January 2008 for $2.9 million, was "owned free and clear by Reynolds." Am. Emergency Mot. Mar. 20, 2008 at 4. He also argued that a general asset freeze was not allowed as the trial court may only grant an asset freeze that is "narrowly drawn to sequester only those funds necessary to satisfy the potential judgment." *Id.* at 3 (quoting *Animale Group Inc. v. Sunny's Perfume, Inc.*, 2007 WL 4259200, at *2 (5th Cir. Dec. 5, 2007)).

$1,216,230.27 million of Reynolds's assets frozen and $1,127,353.99 million of co-defendant Jason Wynn's assets frozen. Order Apr. 2, 2008 at 1. Reynolds had pledged his condominium at the Ritz-Carlton ("the condo") to cover the combined potential $2.34 million liability for himself and Wynn, and the April 2, 2008 order stated that the condo was frozen to satisfy the $2.34 million asset freeze. *Id.* at 2. The instant Motion requests that the Court issue an order directing Reynolds to show cause why he should not be held in contempt for violating the Court's asset freeze in light of evidence that Reynolds had not paid his property taxes and homeowner's association fees, threatening his condo with "imminent liens, foreclosure, and liquidation in a potential bankruptcy."[3] SEC Br. Supp. Mot. 1. The SEC's Motion also requested that the Court enforce its asset freeze by reinstating a general freeze of Reynolds' assets. However, after the Motion was filed, Reynolds filed for bankruptcy and the SEC agreed to a temporary lifting of the asset freeze to allow the sale of Reynolds' condo in part to satisfy liens secured on the condo by Dallas County and his condo association for unpaid property taxes and assessments, which resulted in proceeds of approximately $1.4 million after taxes, assessments, and closing fees were paid. SEC Pre-hr'g Submission Mar. 1, 2011 at 6. The SEC now requests that Reynolds be ordered to pay to the Court $909,338.79 so that the full $2.34 million originally frozen will be available to satisfy any judgment. *Id.* at 7. Alternatively, the SEC requests that Reynolds be ordered to pay $365,754.53 to the Court, which is "the amount that had to be spent out of the frozen assets to remove liens and complete the Condo sale forced by Reynolds'

---

[3] The SEC also claims that Reynolds deliberately and immediately began liquidating his assets when the general asset freeze was lifted and failed to inform the court of back income taxes the IRS was seeking from him at the time the general freeze was lifted, in the amount of $546,383.44. SEC Br. Supp. Mot. 5. Reynolds initially sought to have his delinquent income taxes paid from the proceeds of any condo sale, but he later withdrew this request. SEC Reply at 4 n.3.

misconduct." *Id.* at 6.

The SEC's Motion was referred to a magistrate judge, who issued an order on November 22, 2010 scheduling a hearing on the Motion for December 15, 2010. The afternoon before the December 15 hearing, Reynolds filed his Suggestion of Bankruptcy and Memo Regarding the Automatic Stay. Reynolds argued in his memorandum that civil contempt orders are generally subject to a bankruptcy filing's automatic stay and then argued at the show cause hearing that his bankruptcy filing should stay the show cause hearing as well. In response to the magistrate judge's questioning regarding the late filing of bankruptcy, counsel for Reynolds explained

> [T]here has been a long time during which these discussions have gone on and decision-making and, you know, attempts to get some things worked out with the SEC, which never – never materialized, and that it just got to the point where a decision had to be made, and it was made.
> I can assure you that it wasn't something that was done just at the last minute in an attempt to circumvent this Court and what it had to do, but it is just more of a decision of what needs to happen here, I believe, is there needs to be some forum in which all the creditors can come, make their claims, and decide what to do.[4]

Hr'g Tr. Dec. 15, 2010 at 6. After further presentation of the parties' positions on the automatic stay, the magistrate judge determined that "the inherent enforcement authority of the district court," or determining "whether an order that's already been in existence has been violated and whether that fact and facts concerning that should be certified to the district court" was not impacted by the automatic stay resulting from Reynolds' bankruptcy proceeding. *Id.* at 3-9.

The magistrate judge then continued with the hearing, and the SEC proceeded to examine Reynolds regarding his financial transactions over the past three years as well as his knowledge of

---

[4] Reynolds' attorney David A. Carp stated that he is not representing Reynolds in his bankruptcy proceedings.

the District Court's asset freeze, including his responsibility to pay Dallas County's property taxes assessed on the condo and also his responsibility to pay the Ritz-Carlton's homeowner association assessments. The magistrate judge's Certification of Facts Constituting Contempt of Court found that Reynolds had over $2.1 million in cash at Amegy Bank at the time his assets were initially frozen, all of which he withdrew in April and May 2008. Cert. ¶¶ 2, 4. Reynolds then spent more than $1.5 million in various purchases amounting to more than 100 pounds of gold and silver from April 2008 through 2010. *Id.* at ¶ 5. Meanwhile, he has never paid property taxes for his condo and he also did not pay his utilities and condo association assessments in 2010. *Id.* at ¶ 6. Reynolds admitted that he made various purchases, including gold and silver, despite his knowledge of his duty to pay his property taxes and assessments. Hr'g Tr. Dec. 15, 2010 at 60-61.[5] As a result of his failure to pay these taxes and assessments, on October 25, 2010 the Ritz-Carlton recorded a lien against the title of Reynolds' condo for $28,484.76, which it was preparing to foreclose on in December, and on December 3, 2010 Dallas County initiated proceedings to foreclose on a lien on the title of the condo for failure to pay $139,333.96 in property taxes in 2008 and 2009. Cert. ¶¶ 9-10. The magistrate judge found that the testimony and evidence at the hearing established Reynolds' violation of the Court's asset freeze, such that the burden then shifted to Reynolds to show his inability to comply with the order. Hr'g Tr. Dec. 15, 2010 at 67-68.

Regarding his impossibility defense, Reynolds claims he liquidated all his gold and silver holdings and that he exhausted all of the proceeds on various day-to-day expenses and attorneys'

---

[5] Reynolds stated that he purchased gold and silver because he feared a collapse of the U.S. financial system. Hr'g Tr. Dec. 15, 2010 at 50-51. However, he continued to make these purchases through 2010, well after the risk of collapse appears to have subsided.

fees or which he lost in the stock market or through a failed Chinese business venture. Cert. ¶ 8. He provided no evidence to confirm these expenses and losses other than his testimony that he paid $5,000 per month to his former assistant, $1,000 per month in child support, and $1,000 per month for food, as well as other unsubstantiated miscellaneous expenditures. Id. The magistrate judge found that this testimony was not sufficient to meet his burden on his impossibility defense. Id. at 5.

In addition to arguing generally that Reynolds violated the Court's asset freeze, the SEC alleges that Reynolds schemed to hide his assets. "[R]ather than pay his taxes and protect the condo, Reynolds emptied his bank accounts at the first opportunity, sending hundreds of thousands of dollars to gold merchants and withdrawing amounts of cash $9,000 at a time (i.e., just shy of the amount that would trigger an automated report to the IRS)." SEC Br. Supp. Mot. 2. The SEC also alleges that Reynolds' wholly-owned corporate proxies, Bellatalia, LLC ("Bellatalia") and Lugano Funds, LLC earned income of $7 million and $1.4 million the year before the freeze, and in the seven months leading up to the freeze, Reynolds withdrew over $5.65 million in cash from Bellatalia's brokerage account. Id. at 3. Further, the SEC alleges that Reynolds created a company in the name of his assistant, Stephanie Tubbs,[6] and then funneled millions of dollars to a brokerage account in the name of that company, and that he withdrew over $566,000 in cash from that account in 2010 alone. SEC Pre-hr'g Submission Mar. 1, 2011 at 4. When questioned about this corporation and transfers of assets to or from the corporation at a January 2011 deposition, Reynolds refused to answer, repeatedly pleading the Fifth Amendment in response to every question. Joint Statement 8-12. At the March 10, 2011 hearing before this Court, Reynolds admitted, in response to the SEC's

---

[6] At the December 15 hearing, Reynolds explained that he had been paying his assistant $5,000 a month, even though "she was doing at the end not much." Hr'g Tr. Dec. 15, 2010 at 54.

questioning, that he had transferred thousands of dollars worth of gold to one or more companies created in the name of his assistant, but he claimed that these transfers were loans to his assistant, albeit with no documentation, collateral, or specific terms such as an interest rate.[7] Reynolds continued to assert that the gold had been sold and the funds from these sales had been exhausted through various stock market transactions. However, at no time has Reynolds produced any documentation of these transactions despite his contentions that his secretary had this documentation in her garage and that he could get the required documentation in a week's time.

## III.

## LEGAL STANDARD

A party requesting that another party be held in civil contempt must establish by clear and convincing evidence that (1) a court order was in effect, (2) the order required specified conduct by the alleged contemnor, and (3) the alleged contemnors failed to comply with the order. *See U.S. v. City of Jackson, Miss.*, 359 F.3d 727, 731 (5th Cir. 2004). Furthermore, "the contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order." *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir. 2000) (citation omitted); *Jim Walter Res., Inc. v. Int'l Union, United Mine Workers Am.*, 609 F.2d 165, 168 (5th Cir. 1980) ("In civil contempt proceedings the question is not one of intent but whether the alleged contemnors have complied with the court's order.") (citation omitted). An alleged contemnor "may assert a present inability to comply with the order in question," as a defense, but he also bears the burden of showing his entitlement to such defense and must provide the Court with evidence regarding the same. *U.S.*

---

[7] Such testimony also undermines his credibility given that he previously mentioned only a $100,000 loan to Ms. Tubbs.

*v. Rylander*, 460 U.S. 752, 757 (1983). Further, a party claiming the defense of impossibility must put

forth evidence that is credible and must also be subject to cross-examination. *See U.S. v. Sorrells*, 877

F.2d 346, 349-51 (5th Cir. 1989) (citing *Rylander*, 460 U.S. at 758) ("This was a time for testimony,

and [defendant's] *ex parte* affidavit and uncross-examined testimony were properly disregarded by

the District Court.") (citations omitted).

## IV.

## ANALYSIS

In order to determine whether Reynolds should be held in contempt, the Court must resolve

three issues. First, can the Court proceed with contempt proceedings and ultimately find Reynolds

in contempt given his bankruptcy filing? Second, does the SEC meet its burden of showing that

Reynolds violated the Court's asset freeze? Third, if the SEC has met its burden, does Reynolds meet

his burden of showing his inability to comply with the Court's order?

A.      *The Effect of Reynold's Bankruptcy Filing*

Reynolds initially argued that his bankruptcy filing should have stayed the magistrate judge's

show cause hearing, but the magistrate judge found that the automatic stay did not prevent her from

proceeding on the hearing regarding whether facts constituting contempt should be certified to the

district court. The SEC argued convincingly that multiple grounds justified proceeding despite

Reynolds' bankruptcy filing:

> If Reynolds declares bankruptcy, this Court would retain jurisdiction over this action,
> this contempt motion, and over any frozen assets. As an initial matter, this Court
> would have concurrent jurisdiction to determine the effect of the bankruptcy on this
> case. Because this Court's jurisdiction attached first in time, its jurisdiction would be
> superior. In construing the effect of any bankruptcy, district courts in this scenario
> routinely find that enforcement actions brought by a governmental unit such as the
> Commission are exempt from the automatic stay provisions of the Bankruptcy Code

under 11 U.S.C. § 362(b)(4). That conclusion would apply equally to any contempt proceedings stemming from Reynolds's violation of the asset freeze. Moreover, the Court's freeze of Reynolds's assets could remain in place even if he declares bankruptcy. This power to maintain the asset freeze recognizes a critical principle: the jurisdiction of a bankruptcy court over Reynolds's frozen assets hinges on resolution of the claims before *this* Court. If the Commission succeeds, and demonstrates that Reynolds obtained his cash from investors through illegal back-door IPOs, the fruits of that misconduct – such as the condo – would not be part of his estate and the bankruptcy court would have no jurisdiction over them.

SEC Br. Supp. Mot. 8 n.7 (citing *SEC v. Wolfson*, 309 B.R. 612, 617-22 (D. Utah 2004); *United States v. Fisher*, 2004 WL 62583, at *2 (N.D. Tex. Jan. 9, 2004 ); *SEC v. Bilzerian*, 112 F. Supp. 2d 12, 13-14 (D.D.C. 2000); *FTC v. R.A. Walker & Assocs.*, 37 B.R. 608, 609-613 (D.D.C. 1983)). At the magistrate judge's hearing the SEC also pointed to independent reasons why the contempt proceedings could continue, specifically the court's ability to exercise of its equitable powers, i.e., "making sure that disgorgement is available, should it be part of a judgment," rather than enforcing a money judgment; and the fact that such proceedings would vindicate the integrity of the court. Hr'g Tr. Dec. 15, 2010 at 8. The magistrate judge expressly compared this case to *SEC v. Wolfson*, 309 B.R. 612 (D. Utah 2004) [cited incorrectly as *"SEC v. Wilson"* on the hearing transcript] and explained "[i]n that case, the facts seem almost identical to the ones here, and in that case, the automatic stay under bankruptcy was found not to be applicable." Hr'g Tr. Dec. 15, 2010 at 3-4. For the reasons explained by the SEC, the bankruptcy automatic stay does not preclude further proceedings regarding whether Reynolds violated the Court's asset freeze and should therefore be held in contempt.[8]

---

[8] Further, Reynolds did not continue to argue after the December 15, 2010 show cause hearing that this Court was prevented from continuing with the contempt proceedings by Reynold's bankruptcy filing.

B.      *Did the SEC Meet its Burden of Showing that Reynolds Violated the Court's Order?*

As a preliminary matter, while the magistrate judge has already certified facts constituting contempt of the Court's Order, the District Court must hold a *de novo* hearing at which the Court reviews the evidence again. *See* 28 U.S.C. § 636(e)(6)(B)(iii); *see also Taberer v. Armstrong World Indus., Inc.*, 954 F.2d 888, 904 (3d Cir. 1992) (district court must hold *de novo* hearing with a full presentation of evidence under 28 U.S.C. § 636(e)) (citing *United States v. Raddatz*, 447 U.S. 667, 673-76 (1980)). However, Reynolds and the SEC submitted a Joint Statement of Undisputed Facts in which the parties stipulated to most of the facts set forth in the magistrate judge's Certification of Facts, such that the March 10, 2011 hearing focused on the parties' arguments regarding whether failure to pay property taxes and assessments violated the Court's asset freeze, and whether Reynolds could prove his impossibility defense. Both the magistrate judge's Certification of Facts and the parties' Joint Statement clearly show that Reynolds had sufficient assets to pay his assessments and taxes at least through the majority of the time from when his condo was frozen up until he filed for bankruptcy. They also clearly show that Reynolds bought thousands of dollars worth of gold and silver during this time instead of paying his taxes and assessments, and he knew he had a duty to pay the assessments and taxes. It is less clear that the record shows that Reynolds knew that failure to pay the assessments and taxes violated the Court's asset freeze. However, to show that Reynolds should be held in civil contempt, the SEC does not need to establish that Reynolds knew he was violating the Court's order, only that he did in fact violate it. *See, e.g., Grove Fresh Distribs., Inc. v. John Labatt Ltd.*, 888 F. Supp. 1427, 1436 n.7 (N.D. Ill. 1995).[9]

---

[9] An alleged contemnor's intent, however, is relevant to what remedial measures should be required if a court finds him in civil contempt. *Grove Fresh*, 888 F. Supp. at 1436 n.7.

The SEC clearly has met its burden of showing that the Court's asset freeze was in effect when Reynolds failed to pay his taxes and condo association assessments. Reynold's failure to pay the taxes and expenses resulted in the condo being encumbered by liens. Reynolds argues, however, that the terms of the freeze did not impose an affirmative obligation to pay taxes and assessments, and the SEC "could have refused to agree to enter into any asset freeze without a fund set aside to pay taxes or any other amounts that it knew would become owed, but it did not." Reynolds Br. Opp'n 4. Alternatively, Reynolds argues that the Court's order freezing his condo does not meet the specificity requirements of Federal Rule of Civil Procedure 65(d).[10] Reynolds Pre-hr'g Submission Mar. 1, 2011. The Court finds these arguments unconvincing. As explained by one court,

> Courts are not and should not be compelled to accept "twisted interpretations" or "tortured constructions" of an order. Furthermore, a court order is issued to be obeyed. In effectuating this purpose, a court should not interpret the order in such a way as to render it a nullity. Rather, an order should be interpreted to give effect to its purpose and spirit.

*Grove Fresh*, 888 F. Supp. at 1438 (citing *United States v. Greyhound Corp.*, 508 F.2d 529, 537 (7th Cir. 1974) (other citation omitted)). Reynolds' interpretation of the Court's asset freeze is tortured and would render the Court's asset freeze a nullity, in addition to violating the spirit of the asset freeze. The express terms of the original asset freeze explain that the defendants were "hereby restrained from directly or indirectly withdrawing, transferring, selling, pledging, **encumbering**, assigning, **dissipating**, concealing or otherwise disposing of in any manner" the assets covered by the Order. Order Mar. 13, 2008. While Reynolds did not directly encumber his property, for example

---

[10] FED. R. CIV. P. 65(d) states that "[e]very order granting an injunction and every restraining order must . . . (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail and not by referring to the complaint or other document the act or acts restrained or required."

11

by pledging it as collateral for a loan, his failure to pay led to liens being attached on the property and caused Dallas County to institute foreclosure proceedings. Further, his failure to pay his taxes and assets led to the dissipation of the condo's value at least by the value of those unpaid taxes and assessments. Asset freezes are meant to preserve the status quo by preventing dissipation of assets. *SEC v. Brooks*, 1999 WL 493052, at *2 (N.D. Tex. July 12, 1999). Here, the status quo was a condo unencumbered by liens,[11] and Reynolds' failure to pay assessments and taxes led to the status quo being disturbed. Also, Reynold's contention that the Court's asset freeze did not require him to pay his property taxes and assessments flies in the face of his argument in 2008, that the Court could only freeze the amount of assets necessary to satisfy a judgment against him.[12] *See* Reynolds Am. Emergency Mot. Mar. 20, 2008 at 2. Overall, the Court finds that the Court's asset freeze, by enjoining him from encumbering or dissipating the value of the condo, also required him to pay his property taxes and condo assessments, and by failing do so, Reynolds violated the Court's order. As such, the SEC has met its burden of showing that Reynolds violated the Court's order freezing his condo, and it has done so through clear and convincing evidence.

---

[11] Reynolds argues that the court's asset freeze was vague in part because "Texas law is well settled that a tax lien attaches to property on January 1st of each year to secure the payment of all taxes, penalties and interest ultimately imposed for the year on that property." Reynolds Br. Opp'n ¶ 9, citing TEX. TAX CODE § 32.01. He claims that, based on this law and the SEC's interpretation of the asset freeze, anyone subject to this order would automatically be in violation of the order at the beginning of the year whether they ultimately paid their taxes or not. As explained at the March 10 hearing, the violation of the order occurred not at the beginning of each year, but rather when Reynolds failed to pay his taxes and assessments such that Dallas County could foreclose on the lien.

[12] Further, as argued by the SEC, Reynolds' interpretation of the Court's asset freeze would essentially require the SEC to pay Reynold's back property taxes and condo association assessments out of funds that were intended to satisfy any judgment against Reynolds and co-defendant Jason Wynn.

C.      *Did Reynolds Meet His Burden of Showing Impossibility?*

Having found that Reynolds violated the Court's asset freeze, the Court must now determine whether Reynolds met his burden of showing his inability to comply with the Court's Order. Reynolds admitted at the December 15, 2010 hearing that when the freeze was instituted, he had sufficient assets to pay his property taxes and condo assessments. Reynolds had at least $2 million in bank accounts at the time his condo was frozen and possibly had control of much more than that through corporations he controlled. Further, he also admitted that at least through the majority of the time from the date of the freeze until he filed for bankruptcy that he had sufficient assets to pay the taxes and assessments. Reynolds stated at both the December 15, 2010 and the March 10, 2011 hearings that he had exhausted all of his assets through various expenses, failed business ventures, and stock market transactions. However, he failed to produce any evidence in support of this contention, other than his bankruptcy filing and his testimony at the hearings. Further, the SEC produced evidence at the hearings suggesting that his bankruptcy filing omitted recent purchases and sales of gold and silver as well as a "loan" of $1.5 million in gold to his personal assistant or corporations set up in her name, showing that the bankruptcy filing had incomplete information at best and was fraudulent at worst. The SEC also produced evidence that Reynolds or entities he controlled withdrew more than $984,00 from various accounts since the general asset freeze was modified in 2008, including more than $500,000 in 2010 alone. Reynolds produced no evidence regarding what happened to this money, other than his testimony that it was spent or lost in the stock market.[13] The Court finds that Reynolds is not a credible witness and that his documentation

---

[13] The SEC also suggests that there were likely other assets unaccounted for, but that this amount was that which the SEC was able to identify.

of his inability to pay, namely his bankruptcy petition, is insufficient to show his inability to comply with the Court's asset freeze. *See, e.g., SEC v. Bilzerian*, 112 F. Supp. 2d 12, 23-26 (D.D.C. 2000) (finding that tax return and sworn statements from contemnor and his spouse constituted insufficient accounting of his assets).[14] This evidence is insufficient especially in light of the substantial assets that Reynolds admits he had at one time but which are currently unaccounted for. Overall, the evidence introduced by the SEC strongly infers that not only did Reynolds have millions of dollars in assets but that he also sought to hide these assets through various tactics such as making multiple $9,000 withdraws from his bank accounts, transferring gold to his personal assistant's shell corporations in the guise of a loan with no collateral, no interest, and no documentation, and ultimately filing for bankruptcy on the eve of the magistrate judge's show cause hearing. But the Court need not determine whether Reynolds did in fact hide or attempt to hide his assets to find him in contempt. Instead, the Court need only examine whether he met his burden to show impossibility. Reynolds has failed to produce convincing evidence despite multiple opportunities to do so, specifically, two different hearings three months apart and various rounds of briefing. Now, faced with a finding of contempt, Reynolds offers to produce records he claims are held by his assistant, Stephanie Tubbs, in order to show that he has no assets. Reynolds offered no explanation of why he has failed to produce these records up to this point other than to state weakly that he did not have access them since they were in Ms. Tubb's garage. In light of the multiple opportunities Reynolds has had to produce evidence to support his impossibility defense, the Court **DENIES** Reynold's

---

[14] *Bilzerian* also found that the defendant was required to show that "all reasonable avenues for raising funds have been explored and exhausted." *Id.* at 26-28.

request for more time to produce evidence showing his inability to comply with the Court's order. Further, the Court finds that Reynolds did not meet his burden of showing impossibility to comply with the Court's asset freeze.

## V.

### CONCLUSION

As the SEC has shown through clear and convincing evidence that Reynolds violated the Court's asset freeze, and Reynolds has failed to meet his burden of showing his inability to comply with the Court's order, the Court hereby **FINDS RYAN REYNOLDS IN CIVIL CONTEMPT** due to his violation of the Court's asset freeze. In order to purge this contempt,[15] **Reynolds must pay $909,338.79 to the Clerk of Court by March 30, 2011** in order to secure the original $2.34 million in assets subject to the Court's freeze.[16] **Reynolds must appear before this Court on March 31, 2011 at 3:30 p.m.** so that the Court may assess whether he has complied with the Court's Order. Counsel for the SEC is also required to attend the purgation hearing on March 31, 2011.

---

[15] As explained by the Court in *Bilzerian*, 112 F. Supp. at 16,

> A civil contempt proceeding generally involves three stages: (1) the court issues an order; (2) after the party disobeys the order, the court issues a conditional order finding the recalcitrant party in contempt and threatening to impose a specified penalty unless the recalcitrant party purges itself of contempt by complying with prescribed purgation conditions; and 3) if the party does not fulfill the purgation conditions, the court exacts the threatened penalty.

[16] Reynolds argues that he should not be responsible for the decline in the condo's value over the last three years, as both the decline in value and his bankruptcy "[have] been more a product of the economic situation than anything else" and "it would be a completely different situation if the real estate market were on the rise." Reynolds Pre-hr'g Submission Mar. 1, 2011 at 4. However, the condo was required to be sold to avoid a "firesale" resulting from foreclosure proceedings already initiated by Dallas County and threatened by his condo association. Therefore his failure to pay not only encumbered the condo but also required the sale of the condo at a time when its value had diminished significantly from the time the freeze was instituted. If Reynolds had complied with the Court's asset freeze, there would have been no possibility of foreclosure at this time.

Failure to pay the required amount by the deadline will result in Reynold's incarceration. Further, in order to ensure that he does not flee the jurisdiction of this Court, Reynolds is directed to surrender his passport to the Clerk of Court within 48 hours. Failure to surrender the passport in the required time frame will result in the Court issuing a warrant for Reynold's arrest.


       SO ORDERED.

       SIGNED: March 16, 2011.

       JANE J. BOYLE
       UNITED STATES DISTRICT JUDGE