UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND | § | |
| EXCHANGE COMMISSION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:08-CV-0438-B |
| | § | |
| RYAN M. REYNOLDS, *et al.*, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION & ORDER

Before the Court is Plaintiff Securities and Exchange Commission's ("SEC") Motion for Relief

and Final Judgment ("SEC Mot.") against Defendants Jason Wynn; Wynn Industries, LLC; Wynn

Holdings, LL; Carlton Fleming; Regus Investment Group, LLC; and Thomas Wade Investments,

LLC, filed May 28, 2013 (doc. 329). For the reasons stated below, the SEC's Motion is **GRANTED**

**IN PART AND DENIED IN PART**.

I.

BACKGROUND

This case concerns a "pump and dump" penny stock scheme. The SEC alleges that

Defendants Ryan Reynolds, Jason Wynn, and Carlton Fleming and their wholly-owned businesses

engaged in a scheme to sell unregistered shares of penny stocks[1] in several small companies at inflated

---

[1]The entities' stocks are considered penny stocks because the companies' net tangible assets and average revenue have been below the thresholds established under Section 3(a)(51) of the Exchange Act and Rule 3a51-1 thereunder, 15 U.S.C. 78c(a)(51) and 17 C.F.R. § 240.3a51-1, respectively, and the securities have traded at less than five dollars per share at all times since the stocks began trading. Am. Compl. ¶¶ 73, 121, 157, 159.

1

prices to public investors without providing fair and full disclosures. Am. Compl. ¶ 1.[2] This pump and dump method of distributing stock was primarily effected by "hyp[ing] the shares through spam emails, an advertisement in USA Today, a commercial on CNBC, nationwide promotional mailers, and by inducing family and friends to create the appearance of market demand, while reselling millions of shares out of their own accounts for substantial profits." *Id.*

The SEC filed its Amended Complaint on December 22, 2008. The Amended Complaint alleges, *inter alia*, that Carlton Fleming and his wholly-owned businesses, Regus Investment Group, LLC and Thomas Wade Investments, LLC ( the "Fleming Defendants"), violated Sections 5(a) and 5(c) of the Securities Act of 1933, 15 U.S.C. § 77e ("Section 5"), by engaging in a scheme to sell unregistered shares of ConnectAJet.com, Inc. ("CAJ" or "ConnectAJet"), My Vintage Baby, Inc. ("MVBY" or "My Vintage Baby"), Alchemy Creative, Inc. ("Alchemy"), and Beverage Creations, Inc. ("BCI" or "Beverage Creations") to public investors without fair and full disclosures. Am. Compl. ¶¶ 217-221. It further alleges that Jason Wynn and his wholly-owned businesses, Wynn Industries, LLC, and Wynn Holdings, LLC (the "Wynn Defendants"), violated Sections 5(a) and 5(c) of the Securities Act, as well as Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. *Id.* at ¶¶ 217-221, 228-231, 232-235.[3]

---

[2]The Court takes the allegations of the Amended Complaint as true, pursuant to the parties' Consents and this Court's Final Judgments of Permanent Injunction as to the Wynn Defendants and the Fleming Defendants. SEC Mot. App. 39, 68. For convenience, in referring to the Consents and these Final Judgments, the Court cites to the SEC's appendix to the instant motion, which attaches these documents. The actual Final Judgments were filed as docket entries 234, 242, and 298 on January 3, 2011, January 26, 2011, and October 13, 2011, respectively.

[3]The Amended Complaint also contains allegations against Defendants Ryan Reynolds and his wholly-owned companies Bellatalia, LP and Lugano Funds, LLC (the "Reynolds Defendants"), and Defendants Beverage Creations, Inc., Robert Wieden, and Patrick Dado (the "BCI Defendants"). The BCI Defendants previously agreed to final judgments and are no longer in this case. The SEC's Renewed Motion

In 2011, the Court entered partial judgment as to these Defendants pursuant to separate but similar consents in which they agreed that they violated the federal securities laws as alleged in the complaint and further agreed that the allegations in the complaint "shall be accepted as and deemed true by the Court" in determining the appropriate relief. SEC Mot. App. 39, 68. The orders also permanently enjoined them from violating the relevant securities laws. SEC Mot. App. at 45, 62. Further, the orders provided that this Court would determine the amounts of the disgorgement, prejudgment interest, and civil penalties upon motion of the SEC. SEC Mot. App. 46, 64. Finally, the order as to Fleming provided that "upon such motion of the Commission, the Court shall determine whether it is appropriate to order a permanent Penny Stock Bar pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)]." SEC Mot. App. 47.[4] The SEC filed the instant Motion for Relief and Final Judgments on May 28, 2013, and the motion is now ripe for disposition.

## II.

## ANALYSIS

*A.*   *Disgorgement*

A court may order a party to disgorge profits flowing from securities law violations in order to prevent the wrongdoer from enriching himself by his wrongs. *See, e.g.*, *SEC v. Huffman*, 996 F.2d 800, 802-03 (5th Cir. 1993). Once the SEC has established that a defendant violated securities laws, a court may order the defendant to disgorge a sum of money equal to all the illegal payments he

---

for Summary Judgment as to the Reynolds Defendants is currently pending but has not yet been fully briefed.

[4]The Wynn Defendants already agreed to a penny stock bar in their Consent, and the Court issued a penny stock bar as to Wynn Defendants in the Court's October 13, 2011 Judgment. SEC Mot. App. 64, 68.

received. *SEC v. Blavin*, 760 F.2d 706, 713 (6th Cir. 1985). The SEC bears the initial burden of showing that its requested disgorgement amount reasonably approximates the amount of profits connected to the violation, and then the burden shifts to the defendant to show that this figure is not a reasonable approximation. *See, e.g.*, *SEC v. Amerifirst Funding, Inc.*, No. 3:07-CV-1188-D, 2008 WL 1959843, at *2 (N.D. Tex. May 5, 2008) (citation omitted). A court enjoys broad discretion in determining the amount to be disgorged. *See, e.g.*, *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). Further, "any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty." *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (citation omitted). Cases from the Fifth Circuit demonstrate that "while it is within a court's discretion to consider inability to pay, such a finding is irrelevant to disgorgement liability." *SEC v. Rockwell Energy of Tex., LLC*, No. H-09-4080, 2012 WL 360191, at *3 (S.D. Tex. Feb. 1, 2012) (discussing *Huffman*, 996 F.2d at 803, and *SEC v. United Energy Partners, Ind.*, 88 F. App'x 744, 746 (5th Cir. 2004)). Moreover, if the SEC "shows a causal relationship between the defendant's wrongdoing and the amount by which he was unjustly enriched, that amount of money may be disgorged even if the defendant has otherwise disposed of, reinvested, or spent the particular assets that he wrongfully obtained." *SEC v. Seghers*, 298 F. App'x 319, 336 (5th Cir. 2008).

1.      Fleming Defendants[5]

Based on his consent to the Final Judgment of Permanent Injunction, Fleming is now

---

[5]Fleming is the only Defendant who responded to the instant motion. The Court has not received a response from the Fleming Corporate Defendants, and the Wynn Defendants chose not to respond to the Motion given that they agreed in their Consent that the Court would order the appropriate remedies, which they believe precludes them from challenging the SEC's Motion. Wynn Defs.' Resp. to Order to Show Cause July 1, 2013.

precluded from arguing that he did not violate the federal securities laws as alleged in the Amended Complaint. Also, based on the Final Judgment of Permanent Injunction, the Court accepts the allegations of the Amended Complaint as true. Further, Fleming does not now dispute, at least for the purposes of the SEC's motion for disgorgement, that he violated federal securities laws. The Court also notes that Fleming already agreed to disgorgement in his consent, which stated that "[d]efendants agree that the Court *shall* order disgorgement of ill-gotten gains, prejudgment interest thereon, and a civil penalty . . . . Defendants further agree that the amounts of the disgorgement, civil penalty, and prejudgment interest . . . shall be determined by the Court upon motion of the Commission." SEC Mot. App. 39 (emphasis added). Based on the evidence provided by the SEC, the Court's Final Judgment of Permanent Injunction as to the Fleming Defendants, and the Amended Complaint, the Court finds that Fleming violated federal securities laws and therefore should disgorge his ill-gotten gains.

Having made this finding, the Court now examines the parties' arguments and evidence regarding the appropriate amount of disgorgement. The SEC proposes a modified First In, First Out ("FIFO")[6] methodology to calculate Fleming's disgorgement. SEC Mot. Br. 6. Applying this methodology, SEC Staff Accountant John Kustusch calculates that Fleming's companies Thomas Wade Investments ("TWI") and Regus Investment Group ("Regus") profited by approximately $8,248,188 in total from the pump-and-dump scenes alleged in the Amended Complaint. *Id.* at 6-7 (and citations therein). Fleming argues in his Sur-Reply that the SEC's calculated amount overstates his true gain as it "does not take in account Fleming's investments in the companies and related

---

[6]In calculating gains using FIFO, the earliest sales are attributed to the earliest purchases. SEC Mot. Br. 6 & n.1 (and citations therein).

expenses," though he does not provide a figure of what he believes is his actual gain. *See* Fleming Sur-Reply 4. Such argument is insufficient to show that the SEC's requested disgorgement amount is unreasonable. The Court finds that the amount estimated by the SEC is a reasonable approximation of Fleming's profits connected to the violation.

Fleming's main arguments in opposition to the SEC's request for disgorgement concern his contention that due to his cooperation and inability to pay, the Court should not impose disgorgement, or alternatively, that it should decrease the amount awarded. Further, Fleming argues that the disgorgement amount requested by the SEC is not required as deterrence. The Court rejects these arguments. First, inability to pay and cooperation are largely irrelevant to the disgorgement determination. *See Rockwell Energy*, 2012 WL 360191, at *3. Furthermore, the purpose of disgorgement is not deterrence, but rather to remove a defendant's profit from illegal transactions. *Huffman*, 996 F.2d at 802-03 Given that the SEC has shown that its proposed disgorgement is a reasonable approximation of his gains, and given that Fleming has failed to show that it was not a reasonable approximation, the Court hereby **ORDERS** disgorgement against the Fleming Defendants, jointly and severally, in the amount of $8,248,188.[7]

2.   Wynn Defendants

The same legal standard and analysis apply equally to the Wynn Defendants. The SEC, using the same methodology as explained above, calculates that Wynn's companies profited by approximately $7,177,304 via the pump and dump scheme in violation of Section 5, Section 10(b), and Rule 10b-5. SEC Mot. Br. 7 (and citations therein); *see also* Am. Compl. ¶¶ 217-221, 228-235.

---

[7]The Court expresses no opinion as to what specific assets Fleming has available to satisfy the ordered disgorgement amount or any prejudgment interest or civil penalty.

Because the Court finds that the SEC's approximation is reasonable and the Wynn Defendants have failed to show that it is not reasonable,[8] the Court hereby **ORDERS** disgorgement against the Wynn Defendants, jointly and severally, in the amount of $7,177,304.

B.     *Prejudgment Interest*

The SEC also requests prejudgment interest on the requested disgorgement amount. The Court may award prejudgment interest on disgorgement amounts, in its discretion, in order to prevent parties from benefitting from what is, in essence, an interest-free loan resulting from illegal activity. *See, e.g., SEC v. Jakubowski*, No. 94 C 4539, 1997 WL 598108, at *2 (N.D. Ill. Sept. 19, 1997) (citation omitted). In federal securities cases, courts generally calculate prejudgment interest by applying the underpayment rate published by the Internal Revenue Service ("IRS"). *See, e.g., SEC v. Koenig*, 532 F. Supp. 2d 987, 995 (N.D. Ill. 2007).

1.     Fleming Defendants

Using the IRS' statutory interest rates on the disgorgement amount above,[9] the SEC calculated the Fleming Defendants' prejudgment interest at $1,840,544 for the period ending May 31, 2013. SEC Mot. Br. 8 (and citations therein). Fleming does not set forth any particular objections to the SEC's calculations, and indeed already agreed to the imposition of prejudgment interest, with the amount to be determined by the Court. *See* SEC Mot. App. 39. Instead, he argues, as above, that the Court should deny the requested prejudgment interest in light of his cooperation and inability to pay. Fleming Opp'n 11-12. The Court rejects this argument for reasons similar to the Court's

---

[8]As mentioned previously, the Wynn Defendants did not file a response to the SEC's Motion.

[9]*See* SEC Mot. Br. 7-8; SEC Mot. App. 5-6 at ¶¶ 11-13; SEC Mot. App. 17-21 (setting forth IRS statutory interest rates and methodology for calculating prejudgment interest).

reasoning as to Fleming's arguments as to disgorgement. The purpose of an award of prejudgment interest is to prevent a party from receiving an interest-free loan as a result of his actions, and Fleming's cooperation and inability to pay are insufficient to persuade the Court that such an award is unwarranted here. As such, in its discretion, the Court finds that Fleming should pay the SEC's requested prejudgment interest amount. Accordingly, the Court hereby **ORDERS** the Fleming Defendants to pay $1,840,544 in prejudgment interest.

> 2.     Wynn Defendants

Using the same methodology, the SEC calculated Wynn's prejudgment interest at $1,601,583 for the period ending May 31, 2013. SEC Mot. Br. 8 (and citations therein). The Wynn Defendants filed no objection to the SEC's calculations and already agreed to the imposition of prejudgment interest in their Consent. *See* SEC Mot. App. 68. Accordingly, the Court hereby **ORDERS** the Wynn Defendants to pay prejudgment interest in the amount of $1,601,583.

C.     *Civil Penalties*

The SEC requests third-tier civil penalties against Carlton Fleming, Jason Wynn, and TWI. The Court is authorized to impose a first-tier penalty after a showing of a violation of the Securities Act, and such a penalty does not require any additional finding by the Court. 15 U.S.C. § 77t(d)(2)(A)(2012). Second-tier penalties additionally require a showing that the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." *Id.* at § 77t(d)(2)(B). Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] authorize the Court to impose third-tier civil money penalty if the defendant's violation "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." Under Section 20(d) of the Securities Act and Section

21(d) of the Exchange Act, third-tier civil penalties for a natural person shall not exceed the greater of $130,000, per the inflation adjustment specified by 17 C.F.R. § 201.1003, or the gross amount of pecuniary gain to such defendant as a result of the violation.

Monetary penalties are designed to serve as deterrents against securities law violations, in contrast with disgorgement, which primarily aims to remove a defendant's profit from illegal transactions and which "merely places the offender in the same position he would have been in had he not committed the offense." *SEC v. Lipson*, 129 F. Supp. 2d 1148, 1159 (N.D. Ill. 2001). To determine civil penalties, a court considers the following factors:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Offill*, No. 3:07-CV-1643-D, 2012 WL 1138622, at *3 (N.D. Tex. Apr. 5, 2012) (citations omitted). Courts may award civil penalties for violations of Section 5 of the Securities Act. *See, e.g.*, *Zacharias v. SEC*, 569 F.3d 458, 470-71 (D.C. Cir. 2009); *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005).

### 1.   Carlton Fleming

The SEC requests that the Court impose a third-tier civil penalty on Fleming in the amount of $650,000.[10] Without explaining where the $650,000 figure comes from, the SEC argues that the potential penalty for Fleming could be as high as $8,248,188, his gross pecuniary gain, but that they are only seeking a third-tier penalty that reflects Fleming's "egregious misconduct and the longevity

---

[10]The Court notes that the requested penalty of $650,000 falls within the range of available first-tier penalties, given that Fleming realized a gross pecuniary gain over $8 million.

of [the] pump-and-dump scheme." SEC Mot. Br. 10-11. Although Fleming was not charged with fraud, it is evident from the allegations in the complaint that he, at a minimum, recklessly disregarded the requirements of Section 5 and actively participated in the pump and dump scheme, though perhaps he played a lesser role than Reynolds and Wynn. Indeed, the Amended Complaint alleges that Fleming used his proxy companies to facilitate public offerings without registration from My Vintage Baby, Alchemy, and Beverage Creations, recruited issuers to the IPO scheme, solicited Wynn and Reynolds to participate in the My Vintage Baby and Alchemy offerings, directed the purchase of publicly traded shell companies to facilitate the illegal offerings of Alchemy and My Vintage Baby, helped funnel over 14 million shares of penny stock to the public through unregistered offerings, and falsely represented in subscription agreements that he would "not engage in any activity that will constitute a distribution of the Shares," and that he had "not offered or sold any portion of the Shares to others or with a view to reselling or otherwise disposing of any portion of the Shares." Am. Compl. ¶¶ 2-4, 84-100, 114, 117, 124-137, 148-156, 162, 164-181. Such actions resulted in over $8 million in ill-gotten gains to Fleming. Given that the Court takes the allegations of the Amended Complaint as true for the purposes of this motion, Fleming has clearly engaged in conduct with at least reckless disregard for a regulatory requirement that created a substantial loss or at least a substantial risk of loss for the investors in My Vintage Baby, Alchemy, and Beverage Creations. The Court also notes that Fleming already consented to the imposition of a civil penalty in his consent. *See* SEC Mot. App. 39. As such, the Court would be well within its discretion to impose a third-tier civil penalty.

At the same time, the Court recognizes that the parties dispute Fleming's scienter,[11] whether his conduct was isolated or recurrent, and whether the penalty should be reduced due to his demonstrated current and future financial condition. The Court disagrees in part with the SEC's characterization of Fleming as a repeat offender, as the Court has no indication that Fleming engaged in this type of conduct *prior* to this case. While he violated Section 5 multiple times *in this case*, in the Court's view, such action does not make him a true repeat offender for the purposes of determining whether a civil penalty is warranted. The Court also recognizes that the proposed civil penalty amount is relatively small in comparison to the disgorgement and prejudgment interest amounts already ordered in this case. Finally, the SEC does not dispute that Fleming has cooperated with the Justice Department in a related criminal investigation. *See*, *e.g.*, *Offill*, 2012 WL 1138622, at *3 (some courts have considered factors such as cooperation of defendant with law enforcement authorities).

Overall, considering the factors enumerated in *Offill*, and given that the Court has already found that Fleming violated Section 5, the Court, in its discretion, finds that Fleming should  pay a first-tier civil penalty in the amount of $650,000. Although the parties dispute Fleming's precise role in the pump and dump schemes in this case, Fleming admits that he violated Section 5, and taking the allegations of the Amended Complaint as true, a first-tier civil penalty, at a minimum, is warranted in this case.

---

[11]Fleming claims that he relied on the advice of an attorney in participating in the unregistered offerings. The SEC has not directly addressed this contention.

11

    2.    Thomas Wade Investments[12]

The SEC also requests a third-tier civil penalty in the amount of $650,000 against Thomas Wade Investments. However, the SEC does not explain why a separate penalty should be imposed on TWI, focusing instead on the roles of Fleming and Wynn in the pump and dump scheme, without discussion of the factors for imposition of a civil penalty with respect to TWI specifically. The Court therefore **DENIES** the SEC's motion insofar as it seeks civil penalties against TWI.

    3.    Jason Wynn

The SEC requests a third-tier civil penalty in the amount of $1,300,000 against Jason Wynn. Again, the SEC does not explain how it arrived at that number, but explains that it could have requested up to $7,177,304, Wynn's gross pecuniary gain. The SEC requests a large penalty here "given [Wynn's] fraudulent conduct, that is, the deceptive non-'disclosures' in millions of mailers that hid the essential characteristics of the pump-and-dump scheme." SEC Mot. Br. 11. Wynn does not contest this request, and he has already agreed that he committed securities fraud in violation of Section 10(b) and Rule 10b-5, as well as violating Section 5. The Court notes that Wynn also claims that he is unable to pay any ordered civil penalty, but in contrast with Fleming, there is no indication of Wynn's cooperation with any criminal investigation. Also in contrast with Fleming, Wynn has consented to a final judgment finding him liable for securities fraud, and he appears to have assumed a larger role in the pump and dump schemes in this case. Because of Wynn's egregious

---

[12]The Court has not received a reply from TWI or from Fleming on behalf of TWI. The SEC is not seeking penalties from the other corporate defendants because they are "apparently defunct." SEC Mot. Br. 11.

conduct and high degree of scienter,[13] the fact that his conduct caused substantial losses or at least the risk of substantial losses to others, and the fact that he engaged in multiple pump and dump stock schemes, the Court finds, in its discretion, that a high civil penalty is warranted in this case. Accordingly, the Court hereby imposes upon Jason Wynn a third-tier civil penalty in the amount of $1,300,000.

D.     *Penny Stock Bar*

Finally, the SEC requests a permanent penny stock bar against Fleming. The Securities Act provides that a penny stock bar is appropriate in actions "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock." 15 U.S.C. § 77t(g)(1) (2012). The Securities Act defines a "person participating in an offering of penny stock" to include "any person engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of, any penny stock." *Id.* at § 77t(g)(2). In determining whether a penny stock bar is appropriate, a court considers: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Offill*, 2012 WL 1138622, at *5 (quoting *SEC v. Elliott*, 2011 WL 3586454, at *14 (S.D.N.Y. Aug. 11, 2011)) (internal quotation marks omitted).

---

[13]The allegations in the Amended Complaint state that Wynn engaged in securities fraud and that he knowingly participated in numerous violations of securities laws. In order to artificially inflate the price of the penny stocks, Wynn actively promoted the penny stocks through websites, spam emails, mailers, a newspaper ad, and a commercial on CNBC. Am. Compl. ¶¶ 40-43, 51-57. Furthermore, Wynn knowingly included an incomplete and inaccurate disclosure on the front of the mailers. *Id.* at ¶¶ 74-81.

In *Offill*, based on circumstances similar to those in the instant case, the court imposed a seven-year unconditional penny stock bar on defendants who violated Section 5 of the Securities Act because the defendants "each took part in a scheme in which millions of shares of unregistered securities were sold for millions of dollars, they sold unregistered securities (at least with reckless disregard for the registration requirements, if not intentionally), and such a scheme could easily be repeated." *Offill*, 2012 WL 1138622 at *5. The court found that a seven-year bar was "reasonably likely to protect the investing public from future violations of the securities laws . . . without overpunishing these defendants for their conduct." *Id.* In contrast, the court imposed a permanent unconditional penny stock bar on one of the defendants, a former SEC attorney, given that his conduct was particularly egregious and "his knowledge and experience as a securities regulator make him especially dangerous to the investing public." *Id.* at *5-6.

The Court finds that the *Offill* court's reasoning is equally applicable here, and considering the same factors, finds that a seven-year unconditional penny stock bar against Fleming is warranted. While Fleming's conduct was perhaps not as egregious as that of his co-defendants Wynn and Fleming, he still took part in multiple sales of unregistered securities which resulted in millions of dollars of gross profits to him and his companies with at least reckless disregard for the applicable registration requirements. While Fleming states that he has no current plans to return the securities business, the pump and dump schemes in which he participated could be easily repeated. Overall, the Court finds that a seven-year penny stock bar is reasonably likely to protect the investing public from future violations of the securities law without over-punishing Fleming for his conduct. *See Offill*, 2010 WL 1138622, at *5.

### III.

14

CONCLUSION

For the reasons discussed above, the Court **GRANTS IN PART** and **DENIES IN PART** the SEC's Motion for Relief and Final Judgment as to the Fleming Defendants and Wynn Defendants (doc. 329). The Fleming Defendants are hereby **ORDERED** to disgorge, jointly and severally, $8,248,188, and pay $1,840,544 in prejudgment interest thereon. The Wynn Defendants are hereby **ORDERED** to disgorge, jointly and severally, $7,177,304, and pay $1,601,583 in prejudgment interest thereon. Carlton Fleming is hereby **ORDERED** to pay a first-tier civil penalty in the amount of $650,000. The SEC's request for the imposition of civil penalties as to Thomas Wade Investments is **DENIED**. Jason Wynn is hereby **ORDERED** to pay a third-tier civil penalty of $1,300,000. In addition, Fleming is hereby **BARRED** from engaging in the trade of any penny stock for seven years from the date this judgment is filed. The Court will issue final judgments as to the Fleming and Wynn Defendants setting forth this relief in separate orders.


SO ORDERED.

DATED: July 11, 2013.

_____

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE

15